NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 29, 2024

S24A0171. ALLEN v. THE STATE.

PETERSON, Presiding Justice.

The right to trial by jury is the cornerstone of our justice system. "That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington*, 542 U.S. 296, 305–306 (124 SCt 2531, 159 LE2d 403) (2004). Accordingly, a critical element of that right is that certain questions are to be decided not by judges, but by jurors — ordinary members of a defendant's local community, informed by local mores and values.

The General Assembly has determined that one such question is whether a killing immediately following a serious provocation

should be punished as voluntary manslaughter instead of murder. See OCGA § 16-5-2. When any evidence of such serious provocation exists, it is for the jury, not a judge, to decide whether the provocation was sufficient to mitigate the culpability. This is such a case.

Sherman Lamont Allen appeals his conviction for malice murder in connection with the beating death of his cousin, Treston Smith. In his sole enumeration of error, Allen argues that the trial court erred in denying his request to instruct the jury on voluntary manslaughter as a lesser offense of murder. Because there was sufficient evidence to support the jury instruction, the court erred in refusing to give it. And because the State has failed to carry its burden to show that it is highly probable that the error did not contribute to the verdict, that error requires us to reverse Allen's murder conviction.[1]

---

[1] The crimes occurred on March 16, 2017. On April 25, 2017, an Elbert County grand jury indicted Allen for one count of malice murder, two counts of felony murder, two counts of aggravated assault, and one count of aggravated battery. Following a March 2019 trial, a jury found Allen guilty on all counts.

1. The evidence at trial showed as follows.[2] Allen and Tia Allen began a romantic relationship around 2005. They lived together, raised Tia's son together, and had two children of their own. Although the couple never married, they considered themselves to be married. Tia referred to Allen as her "fiancé" and considered herself married, and Allen claimed that Tia would introduce him as her "husband."

In December 2016, Tia became friends with Smith, who was married and had children of his own. They began talking on a

The trial court sentenced Allen to serve life in prison with the possibility of parole for malice murder. Although the trial court purported to merge the felony murder counts into the malice murder conviction, the felony murder counts were vacated by operation of law, and the other counts merged into malice murder. See *Ware v. State*, 302 Ga. 792, 794-795 (3) (809 SE2d 762) (2018). On April 22, 2019, Allen filed a motion for new trial. After a hearing, the trial court denied the motion on February 13, 2023. Allen filed a timely notice of appeal. On appeal, Allen's new counsel moved to withdraw, so this Court struck the case from the docket and remanded for a hearing on that motion. See Case No. S23A0845 (May 31, 2023 order). On remand, the trial court granted counsel's motion to withdraw, and Allen obtained new counsel. Allen filed a new notice of appeal on September 12, 2023, and the case was docketed in this Court for the term beginning in December 2023 and submitted for a decision on the briefs.

[2] Because this case turns on an assessment of whether an error was harmless, we lay out the evidence fully, rather than in the light most favorable to the jury's verdicts. See *Moore v. State*, 315 Ga. 263, 264 (1) n.2 (882 SE2d 227) (2022).

regular basis as friends and eventually developed a sexual relationship that Tia described as an affair. Sometime in January, Allen heard a rumor about Tia and Smith. In a police interview, Allen stated that he got a call after work from someone who asked if he and Tia were "okay" because someone "caught" Tia and Smith in a car. Although Allen's description of what transpired was not very clear, he said that he then confronted Tia and told her that if she were "really messin' around" then they should go their separate ways, and that Tia denied being with Smith. Allen testified that he confronted Tia sometime in January. According to Allen, Tia also told him to ask her friend who was present, but Allen declined because he knew Tia's friend would lie for her about the rumor he heard.

According to Tia, Allen then "let it go," and she continued her affair with Smith. According to Tia, she first had sex with Smith in February 2017, and she claimed to have sex with him on two occasions. She said she would meet Smith when Allen was asleep or at work, and they would travel from Elberton to Atlanta to be

4

together.

On the evening of March 15, Allen went to work. At 3:19 a.m. on the morning of March 16, he left work. Around 3:50 a.m., after getting breakfast, he went to a gas station and drove around to the back. Smith had parked his tractor-trailer there, and Tia and Smith were together in her parked car nearby. According to Tia, they were in the car together for a few minutes talking and kissing, and then Smith got out of Tia's car so that she could drive to work in Athens.

Smith had just gotten out of Tia's car when Allen drove behind the gas station. Allen got out of his vehicle, hit the front driver-side window of Tia's car with his hand, and said, "B**ch, what you think you doing?" Tia drove off to work. She testified that Allen appeared to be "pretty angry" when he hit her car and yelled at her.

After Tia drove off, Allen engaged Smith in a verbal altercation that led to a physical fight. Surveillance videos from the gas station, which were played for the jury at trial, captured some, but not all, of the fight, because a truck obstructed the view. The video recordings do not show the start of the fight. At some point, Allen

and Smith came into the camera's view. Allen, who was wearing steel-toed boots, could be seen beating and kicking Smith, who was on the ground at that point. Allen then got into his vehicle, drove forward a short distance, stopped his vehicle, backed up, got out, and resumed beating Smith while Smith was lying on the ground. Allen then left the scene. According to the owner of the gas station, who called 911, Allen approached Smith, pulled him out of his tractor-trailer, "beat him," and repeatedly kicked him in the face while he was lying on the ground.

Driving home from the gas station, Allen called Tia multiple times to ask "what's going on" and called several relatives to tell them that he "got in a fight." He showered and changed clothes at home.

Law enforcement officers responded to the scene and found Smith "face down . . . in the gravel, dirt area[.]"The coroner pronounced Smith dead at the scene. The front of Smith's body was muddy but not his back. Shortly after 6:00 a.m., Allen turned himself in at the Elbert County Sheriff's Office.

6

Dr. Colin Hebert, the medical examiner who performed Smith's autopsy, noted that Smith's "head had a lot of swelling and bruising, lacerations, and scrapes, abrasions." Dr. Hebert found gravel embedded in Smith's face, mouth, and tongue. Smith did not have "much in the way of injury on his body below [his] head[.]"Dr. Hebert concluded that Smith died of blunt force trauma of the head.

At trial, Allen testified in his own defense, stating the following. He left work before his shift ended because he completed his assignments. He went directly to a restaurant, ordered food to go, and waited there about 30 minutes because the cook was on a break. After he left the restaurant and neared his home, he decided that he wanted to "take a little detour" and "go riding a round," which he stated was normal for him to do. He said that he stopped at the gas station to adjust a window that was rattling and then circled behind the gas station to turn around, which he also stated was his normal practice. Allen claimed that he did not expect Tia and Smith to be behind the gas station, but when he rounded the corner, he recognized Tia in her car and saw Smith getting out of the

7

car. Smith then walked away from the car.

Allen claimed that he got out of his vehicle and walked toward Tia's car. "I noticed them then," Allen testified, "and I'm like two and two together like this, uh, so it's really true." He admitted to approaching her car, hitting it with the palm of his hand, and calling Tia a "b**ch." He said he was angry, mad, and hurt, because the person he saw Tia with was the same person whom he had asked her about before and the person she had denied having an affair with. Allen said that Tia looked at him like, "damn, I've been caught." Allen acknowledged that he then approached Smith but denied pulling Smith out of his tractor-trailer. Allen said that he and Smith talked for two to five minutes before fighting. Allen testified that he asked Smith what was going on, and Smith was "telling [Allen] something was going on between them." When asked specifically what Allen asked Smith, Allen said that he referenced Smith's status as a married man with his own family and asked, "why you trying to, you know, destroy mine; f**king up mine?" Allen testified that Smith merely responded to each question by repeating,

8

"man, f**k you" with a smirk on his face. Allen also said that Smith initiated the fight by punching Allen "dead in my face" and that the two men went to the ground where Allen put Smith in a chokehold. Allen stated that when he stood up to leave, he "got stabbed in the leg" with a knife, so Allen began fighting again, took the knife from Smith, and got into his vehicle.[3] Allen said that he stopped his vehicle and went back to kick Smith some more because he was angry that Smith had stabbed him. Allen denied ever kicking Smith in the face or head.

Although Allen said at one point in his testimony that he was not "angry like vicious mad," Allen clarified that he was angry when he saw Tia and Smith. And throughout his testimony, Allen repeatedly said that he was angry when he was asking Smith questions. And he said he was "still angry and mad" when he returned to continue fighting Smith. Allen testified that he did not intend to injure or kill Smith and was merely trying to protect

---

[3] An officer who was present when Allen turned himself in testified that photographs admitted at trial of Allen's injuries showed Allen's "left thigh where he had a cut on it."

himself.

During his police interview, which was recorded and played for the jury, Allen said that he drove to the gas station because he had a "feeling of something being off." Referring to Tia as his "fiancé and the mother of [my] kids," Allen stated that when he approached her, he asked, "why you lie?" Allen also said he told Smith, "you married, you got your own, you got everything," "you got a wife," and asked, "you really would do this to my family?", and asked "why?", "why me?," and "why would you, man?" Allen said he was "hurt" because Smith was his cousin; Tia was the mother of his children, the woman he wanted to be with for the rest of his life, his wife; and he wanted only answers, which Smith would not provide. In describing the fight, Allen said he and Smith were tussling, they began hitting each other and fell to the ground. When Allen got up, Allen stated, he kicked Smith and told him to get up, but Smith did not move. Allen said he thought he had merely "knocked [Smith] out or something."

Allen had not seen the knife until after he got off the ground.[4] He then grabbed the knife and got into his car. Allen stated that on the way home from the gas station, he threw that knife out the window. Allen, sobbing in the interview, said he was not a violent person, never fought anyone before, and did "not know what happened."

At trial, Allen requested a jury charge on voluntary manslaughter and objected to the trial court's refusal to give it. In denying the request, the trial court focused on Allen's trial testimony where he stated that he acted in self-defense and did not intend to kill the victim, noting that voluntary manslaughter required an intent to kill.[5] Allen was found guilty of malice murder and other offenses and sentenced to life on the malice murder count.

2. Allen's sole claim on appeal is that the trial court erred in

---

[4] There is no indication Allen saw the knife until after the fight started and Smith was unconscious.

[5] The trial court's statement about intent being a necessary element of voluntary manslaughter was partially correct: when voluntary manslaughter mitigates malice murder, the element of intent to kill is required. See *Carter v. State*, 298 Ga. 867, 870 (785 SE2d 274) (2016). But when voluntary manslaughter mitigates felony murder, the intent to kill is not a necessary element; instead, only the intent necessary to commit the predicate felony is required. See id.

denying his request to instruct the jury on voluntary manslaughter.

OCGA § 16-5-2 (a) provides:

> A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.[6]

---

[6] The dissent's approach and our disagreement herein expose a tension in our case law, albeit one we need not resolve today. This tension arguably stems from the change in the voluntary manslaughter statute in 1968. Prior to 1969, the voluntary manslaughter statutory provision remained materially the same since its initial adoption in 1833, and that 1833 provision provided:

> In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing. Provocation by words, threats, menaces, or contemptuous jestures [sic] shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion, supposed to be irresistible: for if there should appear to have been an interval between the assault or provocation given, and the homicide, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder.

Laws 1833, Cobb's 1851 Digest, § 34, pp. 783-784. When the laws of Georgia were codified in the 1860 Code, the voluntary manslaughter statute expanded

12

adequate provocation beyond actual or attempt assault to include "other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied[,]" but it still retained the exclusion of provocation by words. See 1860 Code § 4222. In 1968, the current version of the voluntary manslaughter statute was enacted and omitted the language stating that "[p]rovocation by words, threats, menaces, or contemptuous jestures shall in no case be sufficient to free the person killing from the guilt and crime of murder." See Ga. L. 1968, p. 1276, § 1.

When the General Assembly changes the language of a statute, that typically signals an intent to change the meaning of the statute. See *Middleton v. State*, 309 Ga. 337, 345 (3) (846 SE2d 73) (2020) (it is "a core principle of statutory interpretation that changes in statutory language generally indicate an intent to change the meaning of the statute." (citation and punctuation omitted)); see also *Transp. Ins. Co. v. El Chico Rests., Inc.*, 271 Ga. 774, 776 (524 SE2d 486) (1999) (presuming that the legislature's removal of limiting language from a law demonstrated a "considered choice" to remove such limits). Yet, despite the General Assembly dropping the "provocation by words" language, we nevertheless held that "while not made an express provision of [the voluntary manslaughter statute], [the rule that provocation by words alone is insufficient] remains a part of the current law of voluntary manslaughter." *Brooks v. State*, 249 Ga. 583, 585 (1) (292 SE2d 694) (1982). *Brooks* cited *Aguilar v. State*, 240 Ga. 830, 833 (242 SE2d 620) (1978), in support, but *Aguilar* engaged in no meaningful analysis. Curiously, despite stating that provocation by words alone was still not sufficient provocation under the new statutory regime, *Brooks* then carved out the exception for when words disclose adulterous conduct. 249 Ga. at 586 ("While it is true that the victim used words to make the defendant aware of her adultery, we find the defendant's adulterous conduct rather than the words describing her conduct served as the serious provocation sufficient to excite a sudden, violent, and irresistible passion." (citation and punctuation omitted)).

It is debatable whether the General Assembly intended in 1968 to keep the old rule in place. The 1968 revisions to the criminal code relied, at least in part, on the Model Penal Code, which was completed in 1962. See *Danuel v. State*, 262 Ga. 349, 354-355 (418 SE2d 45) (1992) (Bell, P.J., concurring specially) (noting the reliance on the Model Penal Code by the Criminal Law Study Committee for the 1968 Code). Scholarship on the issue of adequate provocation reveals that, although the common law largely restricted provocation to four categories (mutual combat, sudden injury, false arrest, and adultery), by the time the Model Penal Code was enacted, this restrictive rule

A trial court must "grant the defendant's request for a charge on the lesser included offense of voluntary manslaughter if there is any evidence, however slight, to support such a charge." *Wilkerson v. State*, 317 Ga. 242, 247 (2) (892 SE2d 737) (2023) (cleaned up). It is a question of law whether any such slight evidence exists. See id.

---

was dispensed with and "left the determination of the adequacy of the claimed provocation in the hands of the jury, without the guidance of a finite, common-law list." Carol S. Steiker, *Justice vs. Mercy in the Law of Homicide: The Contest Between Rule-of-Law Values and Discretionary Leniency from Common Law to Codification to Constitution*, 47 Tex. Tech L. Rev. 1, 4–5 (2014); see also Nicholas N. Stotter, *An Imperfect Solution to a Perfect Defense: Imperfect Self-Defense Balances the Science and Culpability of Battered Spouse Syndrome in Hired-Killer Scenarios*, 52 U. Pac. L. Rev. 905, 919-920 & n.177 (2021) ("Provocation, from its 19th century English roots, began as a defined list of four distinct situations [namely, mutual combat, sudden injury, false arrest, and adultery] that were deemed the only events outrageous enough to warrant the defense. Over time, the categories gave way to a more generalized provocation defined by how [a] reasonable person would be expected to react. The modern approach, exemplified by the Model Penal Code ("MPC"), grants far more latitude in defining adequate provocation: Homicide which would otherwise be murder is committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. While reasonableness is included in the code, the appropriateness of the defendant's actions [is] determined from the viewpoint of a person in the actor's situation under the circumstances as he believes them to be. This method leaves it to the jury to determine whether the explanation, regardless of the provoking action, is sufficient." (footnotes and punctuation omitted)).

No party has briefed the issue of whether *Brooks*'s interpretation of the predecessor to OCGA § 16-5-2 (a) was correct (and if not, whether it should nevertheless be retained under stare decisis). And it is not necessary to resolve this question here, as the existing legal framework regarding discovery of adulterous conduct is adequate to resolve Allen's claim.

14

Our case law has long recognized that discovering a partner's infidelity is generally sufficient provocation to warrant a charge on voluntary manslaughter. See, e.g., *Mays v. State*, 88 Ga. 399, 403 (14 SE 560) (1891) (describing when voluntary manslaughter is authorized); see also *Soto v. State,* 303 Ga. 517, 519 (1) (813 SE2d 343) (2018) ("Although sexual jealousy can be provocation sufficient to warrant a conviction for manslaughter even where the defendant and the victim are not married, it is for the jury to determine whether the actions alleged to have provoked the defendant actually occurred and whether these actions were sufficient provocation to excite the deadly passion of a reasonable person." (citation omitted)). Early on, this was limited to discovering that one's spouse was committing adultery. See id. (stating that murder could be reduced to manslaughter if the defendant killed the victim after discovering the victim and the defendant's wife had committed an adulterous act); see also *Stevens v. State*, 137 Ga. 520, 522 (73 SE 737) (1912) ("the catching of a man in adultery with one's wife" could authorize a jury charge on voluntary manslaughter). But the rationale

15

underlying these cases extends beyond situations where the defendant is "married to one of the parties caught in the compromising situation." *Goforth v. Sate*, 271 Ga. 700, 701 (1) (523 SE2d 868) (1999).

Witnessing one's partner actually commit an "adulterous act" is certainly one manner of discovering a partner's infidelity that can be sufficiently provoking as to warrant a voluntary manslaughter charge. See *Mays*, 88 Ga. at 403.[7] But one can also be sufficiently

---

[7] The dissent relies heavily on *Mays* as purportedly setting forth a bright-line standard that a defendant is entitled to a jury instruction on voluntary manslaughter only when he kills upon catching his partner in an adulterous act. But *Mays* was answering a different, albeit somewhat related, question, so it does not hold what the dissent thinks it does (never mind that cases pre-dating the 1968 amendment to the voluntary manslaughter statute may not apply). There, the defendant was found guilty of voluntary manslaughter, rather than murder, and his primary argument on appeal was that the killing was justifiable, meaning he was not culpable at all. 88 Ga. at 402 ("[T]he able counsel for [appellant] contended that the verdict for voluntary manslaughter was erroneous, that the jury should have found Mays justifiable in killing the deceased."). The court used language regarding what constituted adequate provocation in the context of adultery, but it was not answering whether a voluntary manslaughter charge should have been given. Instead, it was addressing the question of whether the jury should have acquitted Mays altogether, rather than find him guilty of voluntary manslaughter, based on the theory that he was preventing adultery. Id. at 403. The court reviewed the evidence and concluded that it showed that "it was not necessary at that time to kill the deceased to *prevent* the adultery[.]" Id. at 404 (emphasis added).
The court stated in passing that the provocation was "intolerably great,"

16

provoked by finding his partner and another person "in such a position as to indicate with reasonable certainty, to a rational mind, that they had just" committed an adulterous act. Id. Moreover, although words alone are almost never sufficiently provoking, words that disclose an adulterous act of a partner can be. See *Lynn v. State*, 296 Ga. 109, 111 (2) (765 SE2d 322) (2014). That is because words that disclose the adulterous conduct of a partner are "not *just* words, at least to the extent that they cause the accused to genuinely and reasonably believe that his spouse has been unfaithful." Id.; see also *Ware v. State*, 303 Ga. 847, 850 (III) (815 SE2d 837) (2018) ("[I]n order for the conduct communicated by such words to amount to the

---

such as to reduce the offense from murder to manslaughter, but the facts outlined in the opinion did not conclusively show that the wife and the deceased had just committed adultery, although a person in the defendant's position reasonably could have concluded they did. And the opinion noted that there were "circumstances indicating that the defendant" knew his wife was a "lewd" woman, even though the defendant specifically disclaimed suspecting his wife of adultery. See id. at 400-401 (noting that after he was arrested, the defendant gave a statement in which he "denied that he ever had any reason to suspect his wife"). Those circumstances in *Mays* do not undercut the necessity of a voluntary manslaughter charge here. Allen did not catch Tia and Smith in an adulterous act, nor did he say (similar to the defendant in *Mays*) that he suspected that Tia was committing adultery. But the circumstances here, like those in *Mays*, would allow a reasonable person to conclude that Tia had committed an adulterous act.

17

sort of provocation necessary to reduce a murder to manslaughter, *they must disclose* adulterous conduct or, in the case of unmarried persons, sexual relations with other persons during the course of a relationship" (citations and punctuation omitted; emphasis added)); *Strickland v. State*, 257 Ga. 230, 231-232 (2) (357 SE2d 85) (1987) ("[A]lthough the victim used words to make the defendant aware of her adultery, it was the victim's adulterous conduct, rather than her words describing that conduct, which served as sufficient provocation authorizing a charge on voluntary manslaughter."); Wayne R. LaFave & Austin W. Scott, Jr., Handbook on Criminal Law § 76, 575-577 (1972) (noting rule in some jurisdictions that find provocation when "words are informational," in that they are "conveying information of a fact which constitutes a reasonable provocation when that fact is observed[,]" and noting, "[t]he modern tendency is to extend the rule of mitigation beyond the narrow situation where one spouse actually catches the other in the act of committing adultery. Thus, it has been held that a reasonable though erroneous belief on the part of the husband that his wife is

18

committing adultery will do.").[8] To recap then, what this consistent precedent shows is that a defendant's discovery of a partner's sexual infidelity can be the sort of provocation necessary to authorize a voluntary manslaughter charge. Sometimes that discovery may be a personal, first-hand observation of catching one's partner in the act; other times, it may be from being told about the infidelity after the fact.

Applying those principles here, it is plain that there was at least slight evidence to authorize a jury charge on voluntary manslaughter. Both Tia and Allen testified that Allen suspected Tia of having an affair with Smith, Allen's cousin. Allen described in a police interview that he became aware of the possible affair after someone called to ask if he was "okay" and if he and Tia were "okay" because Tia was seen with Smith in a car. Although it is not clear

---

[8] The dissent argues that our decision today makes Georgia an outlier among our sister states. This is wrong for at least two reasons. First, LaFave's explanation of the rule in at least some jurisdictions is consistent with our holding. Second, our holding today does not change anything about Georgia law; it is simply a faithful application of our precedent. Instead, it is the dissent that seeks to reinterpret Georgia law to narrow the application of the voluntary manslaughter statute.

what Allen was told about that incident, Allen stated that he confronted Tia about what he had heard in January and told her that they should go their separate ways if she really were "messin' around." So whatever Allen had been told, his words indicated suspicion that Tia was being unfaithful by "messin' around" with Smith.[9]

In March, after being told that Tia and Smith had been caught together in a car, and being told by Tia that nothing was going on in response to Allen asking whether she were "messin' around," Allen found Tia and Smith in what he could have reasonably perceived as a compromising situation.[10] Smith was leaving Tia's car that was

---

[9] The dissent downplays the significance of this January encounter, suggesting that Tia and Smith were merely in a car together with another female. Although there is no clear evidence of what Tia and Smith were doing in the car, whoever saw Tia and Smith was so concerned by what they saw that they called Allen to see if everything was "okay" between him and Tia.

[10] The dissent takes issue with our characterization of these circumstances, but in arguing that such situations cannot support a reasonable inference that a spouse has committed adultery, it cites *State v. Cooley*, 536 SE2d 666 (S.C. 2000), which supports a voluntary manslaughter charge here. There, the Supreme Court of South Carolina stated that a killer can get a voluntary manslaughter charge if he "finds the other spouse and paramour in *a guilty embrace* or *flagrantly suggestive situation*." Id. at 668 (emphasis added). Euphemisms aside, when a defendant may have killed another person

parked behind the gas station in the middle of the night when she was expected to be on her way to work. A reasonable person could infer that Tia and Smith were meeting this way in order to avoid detection about their rendezvous. There is no evidence that Allen saw Tia and Smith committing an adulterous act, but Allen testified that he saw Smith getting out of Tia's car and that Tia had an expression on her face "like, damn, I've been caught." Allen surmised that Tia had in fact been unfaithful, stating, "I'm like two and two together like this, uh, so it's really true."

For his part, in response to Allen's questions about why Smith as a married man was interfering with Allen's marriage, Smith "smirked" and repeated "man, f**k you" while confirming that "something was going on" between him and Tia. In isolation, these words may not signal an affair. But context matters. Allen stated that Smith said those words after Allen kept pressing him for details in an attempt to understand why Smith and Tia were having an

---

because of sexual infidelity, the critical factor in determining whether a voluntary manslaughter instruction was warranted is whether the defendant acted based on that discovery.

affair. It cannot reasonably be denied that Smith's response can be, though is not required to be, interpreted as an admission that he and Tia had engaged in adulterous conduct. While this evidence may not have been *indisputable* proof, a reasonable person could have found that it amounted to a *reasonable* belief that such conduct had occurred.

Again, it is important to remember what the law requires. The discovery of adulterous conduct can provide the necessary provocation to warrant a voluntary manslaughter charge. See *Ware*, 303 Ga. at 850 (III) (disclosure of "adulterous conduct" may constitute the serious provocation sufficient to require a jury charge on voluntary manslaughter). This is not to say that a jury should or would find Allen guilty of voluntary manslaughter, only that it is for a properly charged jury to make that decision.

Our decision in *Clough v. State*, 298 Ga. 594 (783 SE2d 637) (2016) makes that abundantly clear. There, the defendant broke into his mother-in-law's house, went to a back bedroom, found his estranged wife and the victim sleeping, and stabbed the victim while

yelling "[t]his is what you get for f**king somebody's wife." Id. at 594-595. There was no evidence that the wife and victim were in a state of undress or otherwise had just engaged in adulterous conduct; indeed, the defendant found them sleeping. Id. But the circumstances of them together were such that a defendant could have reasonably believed that his wife and the victim had engaged in adulterous conduct. We noted, moreover, that whatever transpired *prior to* the killing of the victim — including the defendant's possible prior knowledge that his estranged wife was having an affair, his possible prior knowledge of the victim's identity, and his willingness to unlawfully enter his mother-in-law's house — all went to the sufficiency of the provocation that would excite a reasonable person. See id. at 597 (2). What *Clough* makes clear is that "[w]hen there is evidence of alleged provocation, the sufficiency of the provocation is generally *for the jury to weigh and decide*, not the trial court." Id. (emphasis added); see also *Lawson v. State*, 280 Ga. 881, 882 (1) (635 SE2d 134) (2006) (concluding that the evidence was sufficient to permit the jury to find the defendant

guilty of voluntary manslaughter where it showed that the victim and his wife had a "stormy relationship and had separated intermittently," the defendant had approached the victim's wife about having a relationship, the victim's return to the residence angered the defendant, the defendant threatened to kill the victim if he did not leave, the victim left but returned several minutes later, and the defendant shot and killed the victim upon his return); *Richardson v. State*, 189 Ga. 448, 448-449 (1)-(3) (5 SE2d 891) (1939) (trial court erred in failing to charge on voluntary manslaughter where the jury would have been authorized to find the defendant guilty of that crime when the evidence showed that "on the night of the homicide the deceased put her [baby] down by the side of an alley, went into a vacant lot with the husband of the defendant, and lay on the ground with him behind some bushes, and that the defendant immediately thereafter came upon them and assaulted and killed the deceased").[11]

---

[11] At several points, the dissent distinguishes some of our cases by noting that they addressed the sufficiency of the evidence. But this misses the point.

The State and the dissent make several arguments that a voluntary manslaughter charge was unwarranted here. But these all fail. Citing *Tepanca v. State*, 297 Ga. 47 (771 SE2d 879) (2015), the State first argues that there was no evidence that Allen knew of a sexual relationship between Tia and Smith and that any claim of sexual jealousy would be based "wholly on supposition." But *Tepanca* does not apply. There, the defendant killed the victim, who often drove the defendant's paramour to work. Id. at 47 (1). The defendant argued on appeal that he was entitled to a voluntary manslaughter instruction, but we rejected the claim because there was no evidence that the victim and the defendant's paramour were sexually involved. Id. at 49-50 (4). We assumed in that case that "even if" the defendant's former lover told the defendant that she had "gone out with" the victim (which by itself would not show any adulterous conduct), the defendant still would not be entitled to a

---

A case holding that certain evidence is sufficient to support a voluntary manslaughter conviction necessarily means that the same evidence would require a jury charge. Surely the dissent is not arguing that the standard for getting a voluntary manslaughter charge is higher than the standard for obtaining a voluntary manslaughter conviction.

25

voluntary manslaughter charge because there was no evidence that he killed the victim as the result of a sudden, violent, and irresistible passion. Id. at 50 (4). In contrast, here there was more than slight evidence showing that Allen acted out of a passionate response to the sudden disclosure of sexual infidelity.

The State next argues that a voluntary manslaughter instruction was not warranted because Allen repeatedly claimed in his trial testimony that he was acting in self-defense and did not intend to kill Smith, which the State argues conflicted with a voluntary manslaughter claim. We have made clear that intent is necessary for a defendant to be convicted of voluntary manslaughter as an alternative to malice murder. See *Carter v. State*, 298 Ga. 867, 870 (785 SE2d 274) (2016). But contrary to the State's argument, a defendant's claim of self-defense does not preclude an alternative claim of voluntary manslaughter.

In support of its argument, the State cites *Ruffin v. State*, 296 Ga. 262 (765 SE2d 913) (2014), where this Court stated that "appellant's own testimony contradict[ed] a necessary element of

26

voluntary manslaughter, in that he claim[ed] he did not intend to kill, but was acting in self-defense[.]" Id. at 264 (2) (b). But unlike this case, there was nothing else in *Ruffin* that would have supported a voluntary manslaughter charge. Our recitation of the facts there did not show even slight evidence of provocation; instead, it showed that the killing was likely premeditated. Id. at 262-263. See also *Davis v. State*, 312 Ga. 870, 874 (2) (866 SE2d 390) (2021) ("Neither fear that someone is going to pull a [weapon] nor fighting are the types of provocation which demand a voluntary manslaughter charge." (citation and punctuation omitted)).

Although the State argues that Allen testified that he acted in self-defense and did not have an intent to kill, it also points out that the video recording of the killing here "fundamentally undermines" Allen's self-defense claim without explaining why the same evidence would not undercut his testimony about his intent. Indeed, a jury would have been authorized to conclude from the brutality of the beating, as displayed in the uncontroverted video recording, that Allen had an intent to kill. See *Burley v. State*, 316 Ga. 796, 806 (888

27

SE2d 507) (2023) ("Intent to kill may be inferred from the nature of the instrument used in making the assault, the manner of its use, and the nature of the wounds inflicted, as well as the brutality and duration of the assault." (citation and punctuation omitted)). Such an intent is necessary for a defendant to be convicted of voluntary manslaughter as an alternative to malice murder. See *Carter v. State*, 298 Ga. 867, 870 (785 SE2d 274) (2016) ("[A] defendant must have an intent to kill in order" to be convicted of voluntary manslaughter instead of malice murder).

To the extent the State reads *Ruffin* as precluding jury charges on inconsistent theories, any such reading has been superseded by more recent caselaw. See *McClure v. State*, 306 Ga. 856, 864 (1) & n.17 (834 SE2d 96) (2019) (a "defendant is entitled to a requested jury instruction regarding an affirmative defense when at least slight evidence" supports that theory, "regardless of whether th[at] theory . . . conflicts with any other theory being advanced by the defendant"). We have made clear recently that regardless of whether a defendant's theories conflict, "[i]f there is some evidence to support

28

more than one theory, a defendant who pursues alternative defense theories is entitled to requested charges on both theories." *Gaston v. State*, 307 Ga. 634, 637 (2) (a) (837 SE2d 808) (2020) (citations and punctuation omitted); see also *McClure*, 306 Ga. at 860 (1) ("Criminal defendants, like other litigants, are entitled to pursue alternative theories, even when those theories are inconsistent."); *Gregoroff v. State*, 248 Ga. 667, 670 (285 SE2d 537) (1982) ("[T]he general rule [is] that an accused is permitted to interpose inconsistent defenses in a criminal case." (footnote omitted)).

As discussed above, there was at least slight evidence of provocation to support a voluntary manslaughter claim, so the court was required to give the instruction despite Allen's main theory that he acted in self-defense. Whether the evidence regarding provocation is persuasive is not for the trial court, or this Court, to say in determining whether a voluntary manslaughter charge was warranted. That determination may be made only by a properly charged jury. Because the trial court refused to allow the jury to make that determination, it erred.

The dissent reaches a contrary conclusion, but does so engaging with only a subset of the relevant precedent, framing facts and context only in a light favorable to a theory of guilt of murder, and becoming distracted by "practical and concerning" policy implications of our voluntary manslaughter statute's requirement that juries decide some important questions. First, the dissent contends that judges must be the gatekeepers to keep reasonableness questions away from the jury. But assessing what is reasonable, what reasonable inference can be drawn from the evidence, or more relevant here, whether certain qualifying conduct is sufficiently provocative is almost always a jury question. See *Anderson v. State*, 248 Ga. 682, 683 (3) (285 SE2d 533) (1982) ("Whether or not a provocation, if any, is such a serious provocation as would be sufficient to excite a sudden, violent, and irresistible passion in a reasonable person, reducing the offense from murder to manslaughter, is generally a question for the jury.")[12]; cf. *Smith v.*

---

[12] This point is well-accepted by now. See, e.g., *Jones v. State*, 314 Ga. 692, 695 (878 SE2d 502) (2022); *McGuire v. State*, 307 Ga. 500, 504 (837 SE2d

30

*State*, 280 Ga. 161, 162 (625 SE2d 766) (2006) ("Questions as to the reasonableness of hypotheses are generally to be decided by the jury[.]" (citation and punctuation omitted)); see also *Elrod v. McConnell*, 170 Ga. 892, 892 (1) (154 SE 449) (1930) ("Although there may be no conflict in the evidence, the matter should be left to the jury, where reasonable men might differ as to the inferences to be drawn from certain evidence.").

Our long-settled precedent makes clear that all that is required is there be "slight evidence" of serious provocation. The dissent spends much time showing that Allen's claim of serious provocation was not persuasive or reasonable. In doing so, the dissent puts itself in the position of the jury and assesses the reasonableness of that claim. But as we have made abundantly clear before, in determining whether a jury charge was warranted,

> [w]e must decide *only* whether there was slight evidence
> to support the jury instruction. And if there was slight
> evidence supporting the instruction[,] . . . it is *irrelevant*
> whether we find that slight evidence persuasive in the

---

339) (2019); *Moses v. State*, 270 Ga. 127, 129 (5) (508 SE2d 661) (1998).

face of contrary evidence; that question was reserved exclusively for the jury.

*McIver v. State*, 314 Ga. 109, 139-140 (2) (g) (875 SE2d 810) (2022) (citation and punctuation omitted; emphasis added). A properly instructed jury could weigh all the evidence here and decide that the provocation was insufficient. But that is not the question before us. We are tasked with determining only whether there is slight evidence of provocation such that a jury instruction on voluntary manslaughter had to be given.

The dissent reads our case law as requiring the defendant to have caught his spouse or partner in the act of adultery or hear about it in a taunting way, leaving no room for anything else. That is simply not the law. It is the disclosure or discovery of adulterous conduct that is required, and that element has been met here. Sometimes discovery happens during the act; sometimes it happens later. The dissent does not meaningfully engage with *Clough*, where the defendant neither caught the defendant in an adulterous act — the victim was merely sleeping in the same bedroom with another

32

man — nor was there evidence that he had heard about any such conduct. 298 Ga. at 595. Indeed, in concluding that there was slight evidence of serious provocation, we noted that the defendant's possible knowledge of the affair went to the sufficiency of the provocation, which was an issue for the jury to resolve. Id. at 597 (2).

The dissent acknowledges our case law indicating that although words by themselves generally do not serve as sufficient provocation, words disclosing adulterous conduct can.[13] See *Strickland*, 257 Ga. at 231 (2) ("[A]lthough the victim used words to make the defendant aware of her adultery, it was the victim's adulterous conduct, rather than her words describing that conduct, which served as sufficient provocation authorizing a charge on voluntary manslaughter."). Indeed, it seeks to apply this exception to rule that words by themselves are not generally seriously

---

[13] The dissent makes another misstatement of the law that there is a "single, narrow" exception to the words-alone rule, concluding that it can only be for words disclosing adultery. But our precedent holds otherwise. See, e.g., *Scott v. State*, 291 Ga. 156, 157-158 (2) (728 SE2d 238) (2012) (concluding that the defendant's discovery that his niece was being molested by the victim, along with defendant's taunting were sufficient to warrant voluntary manslaughter instruction).

provoking. The dissent suggests that such disclosures must be of a "taunting" nature. Even if that proposition were true,[14] there is some evidence of taunting here. In particular, there is evidence that Smith

[14] Our case law has recognized that words disclosing adulterous conduct can be sufficient provocation and has distinguished cases concluding that no voluntary manslaughter charge was required or that the charge given was adequate on the basis that no disclosure of adulterous conduct had occurred, not that words can never play a role in supporting a voluntary manslaughter instruction. In *Ware*, after reaffirming the general principle that words disclosing adulterous conduct can be serious provocation, we distinguished cases on the basis that they involved "statements by a victim that she wants to end the relationship, is involved with or prefers the affections of another, or even has chosen to leave the defendant for another — but that stop[ped] short of disclosing extra-relationship sexual conduct[.]" 303 Ga. at 850-851 (III). *Ware* distinguished those cases because they did not involve any taunting or bragging about adulterous conduct; indeed, many did not involve any disclosures that immediately preceded the killing. See, e.g., *Brown v. State*, 294 Ga. 677, 680-681 (3) (755 SE2d 699) (2018) ("[T]here [was] no evidence that [the victim] had recently engaged in sexual relations with her out-of-state husband or that she taunted [the defendant] with such conduct."); *Mack v. State*, 272 Ga. 415, 417-418 (2) (529 SE2d 132) (2000) ("[T]here was no evidence that appellant's homicidal acts were preceded by the victim verbally taunting appellant with her adulterous conduct."); *Mayweather v. State*, 254 Ga. 660, 661 (3) (333 SE2d 597) (1985) (concluding that "victim's alleged statement that she was out with another man" was not sufficient provocation).
But at least one case cited in *Ware* is somewhat anomalous. In *Davis v. State*, we observed that "there [was] no evidence the victim recounted her adulterous conduct to Appellant or taunted him with descriptions thereof." 290 Ga. 421, 424 (2) (721 SE2d 886) (2012). But then we suggested that there was, stating: "In, fact the only evidence that the victim even committed adultery was that Appellant told [his ex-wife] that his wife admitted to an affair." Id. *Davis*'s ultimate conclusion that the court did not err in charging that words alone were insufficient provocation to support a verdict of manslaughter was grounded in its observation "there was no evidence of any sort of taunting by the victim with adulterous conduct[.]" Id. And as described above, there is at least slight evidence of taunting here.

34

smirked at Allen when stating that there was "something going on" between Smith and Tia. This may not be the strongest or most compelling evidence, but again, only slight evidence is required for a jury instruction to be warranted.

The dissent oversimplifies its recitation of the factual basis of the deadly encounter and views the evidence only in the light most favorable to its conclusion. It does not look at the evidence reasonably as a whole. Instead, it focuses on whether Allen's response to the situation was reasonable. But this question is for the jury, not judges, to decide.

The dissent fundamentally misunderstands this point. We are not holding, as the dissent would suggest, that judges must give a voluntary manslaughter charge any time someone claims provocation. Under our decision today, our current legal framework would still keep judges in their gatekeeping role, deciding whether the alleged provocation is of the type that our case law has concluded is "sufficient to excite" the "passion in a reasonable person[.]" OCGA § 16-5-2 (a). And as this opinion makes clear, the discovery of a

partner's adulterous conduct — whether in the act or through a verbal disclosure — is the prototypical type of provocation that can excite the passions of a reasonable person.[15] But our legal framework makes clear that once a trial court performs its gatekeeping function in determining whether there is slight evidence of serious provocation, it is ultimately up to the jury to decide whether that provocation was actually sufficient to excite a sudden, violent, and irresistible passion in a reasonable person. See *Anderson*, 248 Ga. at 683 (3); see also Peter Westen & Frank G. Millard, *Individualizing the Reasonable Person in Criminal Law*, 2 Crim. L. & Phil. 137, 156 (2008) ("The reason the law delegates final authority to jurors to make policy decisions to mitigate murder to manslaughter is precisely because the law believes that jurors, who are drawn at random from the community, are better equipped than judges to make such policy decisions."); Kit Kinports, *Criminal Procedure in*

_____

[15] Discovery of adulterous conduct is not the only type of provocation that can constitute "serious provocation" under OCGA § 16-5-2 (a). See, e.g., *Williams v. State*, 309 Ga. 212, 217 (2) (845 SE2d 573) (2020) (noting that a jury could find a defendant engaged in mutual combat was guilty of voluntary manslaughter rather than murder).

*Perspective*, 98 J. Crim. L. & Criminology 71, 131 (2007) ("[T]he concept of objective reasonableness is utilized both to reflect community values and to enforce uniform standards of behavior." (footnote omitted)); Dolres A. Donovan & Stephanie M. Wildman, *Is the Reasonable Man Obsolete?: A Critical Perspective on Self-Defense and Provocation,* 14 Loy. L. A. L. Rev. 435, 448 (1981) ("[W]hen it was first introduced into the law of provocation, the reasonable man test was a device for delivering to the jury, in its role as the conscience of the community, the normative or value judgment as to the degree of moral culpability to be assigned to the particular offender.").[16]

---

[16] The dissent rejects the notion that juries are to determine whether a provocation was reasonable or sufficient to reduce the offense from murder to voluntary manslaughter because the text of OCGA § 16-5-2 (a) suggests that juries are to assess only whether "an interval between the provocation and the killing" is "sufficient for the voice of reason and humanity to be heard[.]" But many defenses or claims of mitigation are properly left for the jury to resolve without express statutory language saying so. See, e.g., OCGA §§ 16-3-2 (a) ("A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence."); 16-3-4 (a) ("A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of involuntary intoxication, did not have sufficient mental

The dissent goes on to offer a parade of horribles that will flow from today's decision. But none of those horribles follow from properly instructing a jury. Georgia law trusts juries. So should the dissent.

And, in any event, even if a jury were to convict someone of voluntary manslaughter in a case where we think murder would have been more appropriate, a voluntary manslaughter conviction is not an acquittal. It is a felony that carries a potential sentence of 20 years in prison (and any lesser sentence would be up to the judge,

---

capacity to distinguish between right and wrong in relation to such act."); 16-3-21 (a) ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in Code Section 16-3-23, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony."); 16-3-23 ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only" under certain enumerated circumstances).

not the jury). 20 years in prison is a serious sentence for a serious crime.

In sum, our decision today rests on solid footing based on existing legal precedent. Under that case law, the trial court's refusal to charge the jury on voluntary manslaughter was erroneous.

3. The State argues that any error was harmless. We disagree.

"A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict[.]" *Smith v. State*, 313 Ga. 584, 587 (872 SE2d 262) (2022) (citation and punctuation omitted). In conducting that analysis, "we assess the evidence from the viewpoint of reasonable jurors, not in the light most favorable to the verdicts." *Hatney v. State*, 308 Ga. 438, 441 (2) (841 SE2d 702) (2020).

The State has not carried its burden. The State primarily relies on the fact that Allen testified repeatedly that he was not angry but attacked Smith in self-defense after Smith hit him. Allen did testify that he was not angry, but he also repeatedly said that he was. These

conflicts are for the jury to resolve, not this Court. And although Allen's self-defense claim was inconsistent with his argument that he was sufficiently provoked, Tia testified that Allen appeared to be "pretty angry" upon finding her and Smith and that Allen pounded on her car. This all happened *before* any physical interaction with Smith. Moreover, the video recording shows a nearly unrelenting attack on Smith, which included multiple kicks to Smith's head. A jury could find that Allen's actions as evidenced by the recording were consistent with the type of anger or rage that usually accompanies the type of passion a provoked defendant may experience and for which a voluntary manslaughter instruction is warranted. See *Williams v. State*, 306 Ga. 717, 721 (2) (832 SE2d 805) (2019) (noting that voluntary manslaughter requires that a defendant "was so angered that he reacted passionately," not merely that the defendant "was attempting to repel an attack" (cleaned up)); 2 Wayne R. LaFave, Substantive Criminal Law § 15.2 (a) (3d ed. Oct. 2023 update) (noting that "[t]he 'passion' (emotional disturbance) involved in the crime of voluntary manslaughter is generally rage

40

(great anger)”).

As discussed above, the video recording is evidence of Allen's intent to kill, which is an element present in both malice murder and voluntary manslaughter. In several cases, we have affirmed malice murder convictions and concluded that the failure to charge on voluntary manslaughter was harmless where there was strong evidence that the killing was premeditated or there was a long interval between the provocation and the killing. See, e.g., *Heyward v. State*, 308 Ga. 570, 573 (2) (842 SE2d 293) (2020) (evidence that one day before killing the victim, the defendant talked about killing the victim and showed a weapon that matched the murder weapon, undercut the defendant's claims that he took the gun from the victim during the encounter and that he killed the victim in response to the victim's actions); *Hatney*, 308 Ga. at 441-442 (2) (concluding that even if the victim's conduct towards the defendant was sufficiently provocative, the failure to charge was harmless where: (1) there was a significant period of time between the alleged provocation and the beating of the victim — the defendant dressed and put on his boots

41

in preparation for the attack, knocked out the victim, tied his hands and feet, wrapped him in a sheet, and moved him to several rooms, including "up and down" steps before finally beating him to death; and (2) the defendant's described motives for the attack showed deliberation rather than irresistible passion).

But none of those circumstances are present here. There was no significant interval between the provocation and the initial attack on Smith. And the State presented no evidence supporting a theory of premeditation. Allen's reasons for being at the gas station and just happening to come upon Smith and Tia are difficult to credit, but even a rejection of Allen's explanation does not mean that he premeditated finding and killing Allen. Instead, a jury could conclude from the evidence that Allen was suspicious of Tia and followed her there to confirm (or dispel) his suspicions and reacted passionately to the totality of what he discovered there.

To be sure, in his initial statements to police and in his trial testimony, Allen did not provide a consistent story about his intent or about the level of anger he experienced as a result of seeing Tia

and Smith. The dissent does an excellent job pointing that out. If all we had to go by were those statements and testimony, we might agree with the dissent that there was no harm here. But the video recording also carries weight, perhaps more so because it presents irrefutable evidence. A jury would plainly be authorized to conclude from watching that recording that Allen was upset upon seeing Tia and Smith. He hit Tia's car with his hand and then followed Smith. And as mentioned, it shows Allen's rage as he mercilessly beat Smith.

The fact that Allen prioritized a self-defense claim does not diminish the harm here. That defense was weak at best. The State acknowledges as much. The dissent cites then-Presiding Justice Nahmias's concurrence in *McClure v. State*, 306 Ga. 856 (834 SE2d 96) (2019), for the idea that any failing to instruct on alternative defenses is likely to be harmless. That argument misunderstands Presiding Justice Nahmias's reasoning; in *McClure*, he explained

> Presenting inconsistent defenses to the jury, particularly when the evidentiary support for one defense is considerably weaker than for others or where a defense is

43

> contradicted by the defendant's own account of events, risks losing credibility for *all* of the defenses.

Id. at 866 (Nahmias, P.J., concurring) (emphasis in original). That reasoning applies only when there is a stronger defense already that the new inconsistent defense would undermine. That is not this case; here, the video recording of the incident is perhaps the strongest piece of evidence in this case, and that recording points far more strongly to a claim of voluntary manslaughter than a self-defense claim. The trial court removed from the jury's consideration the stronger of Allen's defenses, and we cannot say that this was harmless.[17]

---

[17] One final point. The dissent notes that Allen rejected a pretrial voluntary manslaughter plea deal and, instead, focused at trial on self-defense as main defense. The fact that Allen received a plea offer undermines the dissent's claim that no voluntary manslaughter charge was warranted, because prosecutors must have a factual basis for the plea in order to secure a conviction. See *Oliver v. State*, 308 Ga. 652, 654 (1) (842 SE2d 847) (2020) ("Uniform Superior Court Rule 33.9 provides that a trial court, before entering a judgment upon a guilty plea, must make an inquiry on the record as may satisfy the trial court that there is a factual basis for the plea." (citation and punctuation omitted)). In any event, this fact is irrelevant to a harmlessness analysis because we must "assess the evidence from the viewpoint of reasonable jurors" to determine "whether it is highly probable that the error did not contribute to the verdict." There is no indication the jury heard evidence that Allen rejected the plea offer.

In sum, there is evidence of what is universally considered serious provocation. Although there is very strong evidence that Allen intended to kill Smith, this evidence does not answer the question of whether that intent was the result of serious provocation such that he could be found guilty of the lesser offense of voluntary manslaughter. On this record, the State has failed to establish that it is highly probable that not a single juror would have found Allen guilty of voluntary manslaughter. Therefore, it cannot show that it is highly probable that the court's error in failing to instruct the jury on voluntary manslaughter did not contribute to the verdict. Accordingly, we reverse Allen's malice murder conviction.

---

Moreover, the fact that Allen rejected a plea deal shows nothing about his subjective assessment of the evidence, much less an objective one. The record indicates that the plea offer was "20 years to serve" for voluntary manslaughter. Although this is less than the maximum sentence for a murder conviction, it is the maximum sentence for voluntary manslaughter. See OCGA §§ 16-5-1 (e) (1) ("A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life."), 16-5-2 (b) (voluntary manslaughter conviction shall be "punished by imprisonment for not less than one nor more than 20 years"). Allen's rejection of the plea more likely reflects his decision to take his chances at trial and possibly obtain an acquittal rather than face the certainty of a lengthy imprisonment.

45

Because the malice murder conviction is now reversed, the felony murder counts based on aggravated assault and aggravated battery are no longer vacated as a matter of law. But the failure to give the voluntary manslaughter charge also affects these counts under the reasoning of *Edge v. State,* 261 Ga. 865, 865-867 (2) (414 SE2d 463) (1992), so the verdicts on those counts cannot stand, either. See *Clough,* 298 Ga. at 597-598 (2) (after reversing murder conviction on failure to provide voluntary manslaughter charge, concluding that unvacated convictions for felony murder based on aggravated assault and burglary also had to be "reversed" under *Edge*). On remand, the State may retry Allen for malice murder and felony murder, as the evidence was sufficient as a matter of constitutional due process to support a conviction on those counts. See *Jackson v. Virginia,* 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). The guilty verdicts on the other counts are not affected by a voluntary manslaughter charge, but the trial court may merge or unmerge some of those counts depending on the disposition of the murder charges on remand. See id. at 598 (2).

*Judgment reversed. All the Justices concur, except Boggs, C.J.,*
*and Ellington, LaGrua, and Colvin, JJ., who dissent.*

BETHEL, Justice, concurring.

I join the opinion of the Court because I believe it accurately gives effect to the directives of OCGA § 16-5-2 (a) (the voluntary manslaughter statute) and faithfully grapples with and applies our precedent.[18] Moreover, it has the added benefit of empowering juries, which seems to be the clear default of not only this statute but Georgia law generally. I also note my agreement with the dissent that, in determining whether a voluntary manslaughter instruction is warranted, the trial court serves as a gatekeeper, assessing both the quality of the evidence — that is, if the jury should be instructed to consider whether the defendant "act[ed] solely as the result of a sudden, violent, and irresistible passion" based on the character of the alleged provocation, see OCGA § 16-5-

---

[18] The dissent suggests that I have articulated a different standard than the majority, though it does not explain this characterization. See Dissent at ___ n. 10. Contrary to this suggestion, I concur in full in the majority opinion and do not endeavor to articulate a different standard than the majority. Rather, as explained below, my focus in writing separately is to attempt to make sense of our precedent in a way that more fully captures our voluntary manslaughter statute and its application.

2 — and the quantum of such evidence, see Maj. Op. at ____ (noting that a defendant's request for a jury charge on voluntary manslaughter must be granted if supported by *any* evidence, however slight).

In evaluating the *quality* of the evidence at issue here, the majority and the dissent, appropriately and understandably, turn to the underlying case law in an effort to discern whether the evidence adduced in this case authorized a jury charge on voluntary manslaughter. But it seems to me that this narrow focus comes at the expense of the requirements actually imposed by OCGA § 16-5-2 (a), which speaks not in terms of infidelity but to the presence of a "sudden, violent, and irresistible passion resulting from serious provocation." Thus, in my view, the work done by the majority and the dissent reveals that the underlying case law not only is inconsistent and confused, but that the case law also fails to provide clear guidance to the bench, the bar, and the balance of Georgia's citizens. What follows is merely my attempt to make sense of what strikes me as a woeful tangle of decisional law.

Decisions applying the common law rule on infidelity leave me with the strong impression that, as a historical matter, a defendant's discovery of his or her intimate partner engaged in sexual congress with another has been accepted as obviously, and perhaps inarguably, representative of the sort of provocation that could overwhelm a reasonable person's senses such that a jury should be instructed on voluntary manslaughter and, potentially, a finding of a lower degree of culpability.[19] Indeed, at common law, the ancestor of our voluntary manslaughter statute, most cases appear to involve marital infidelity. So it is no surprise that the common law rules were generally couched in terms of the discovery or disclosure of marital infidelity. In determining whether a voluntary manslaughter charge is appropriate, these "discovery in the act" fact patterns draw, I believe, the first line. For instance, if a defendant

---

[19] I note that this historic view of the shock associated with the discovery of sexual infidelity may, for some, seem archaic and immaterial to the question of reduced culpability for taking the life of another. Moreover, it seems patent that this understanding of voluntary manslaughter is deeply rooted in a time and culture where wives were not considered equals or peers, but something more akin to property. But the wisdom of the rule is not at issue here.

walks in on an event that could reasonably be understood as tantamount to discovering an intimate partner engaged in sexual congress with another, it is well settled that such circumstances are sufficiently provocative in quality to warrant a voluntary manslaughter charge. See, e.g., *Richardson*, 189 Ga. at 448-449 (1); *Clough*, 298 Ga. at 594-595; *Mays*, 88 Ga. at 403.

These "discovery" cases then lead to "dramatic disclosure" cases. In those cases, the defendant does not actually find his or her intimate partner in the throes of intercourse or its equivalent, but nevertheless learns that such an act "just then" occurred or previously occurred. The circumstances of such disclosure can be sufficiently shocking as to raise the question of whether a reasonable person *might* be expected to have a passionate, emotional, and violent response equal to the sort of response that would be evoked by the discovery of the act itself. See, e.g., *Lynn*, 296 Ga. at 111 (2); *Strickland*, 257 Ga. at 231-232 (2); *Brooks v. State*, 249 Ga. 583, 585-586 (292 SE2d 694) (1982).

Within these dramatic disclosure cases is where I find the

51

second line — and the one that applies in this case. As I understand it, where the totality of the evidence before the jury could support a finding that a defendant, in the moments immediately preceding the violence that led to a homicide, first learned that his or her partner had been sexually unfaithful — or learned of a circumstance that was of a similarly shocking and seriously provocative character— then the defendant is entitled to have a jury determine whether any sudden, violent, and irresistible passion flowing from that serious provocation was the sole cause of that defendant's actions.[20] This understanding of the standard also strikes me as concordant with cases involving a shocking disclosure unrelated to sexual infidelity. See, e.g., *Scott v. State*, 291 Ga. 156, 157-158 (2) (728 SE2d 238) (2012) (considering the "cumulative effect" of appellant's niece disclosing to him that the victim molested her, his sister's refusal to believe her daughter, and the victim's taunt regarding his

---

[20] Obviously, it would not be enough to merely suspect one's intimate partner of infidelity or to observe the partner in innocuous, nonetheless suspicious, behavior with another. Rather, the circumstances must be sufficiently serious to provoke a response on par with a shocking discovery or disclosure of sexual infidelity.

molestation of the child, and concluding that such evidence supported voluntary manslaughter charge).

In short, I think OCGA § 16-5-2 (a) authorizes a voluntary manslaughter charge where slight evidence shows that, immediately prior to the crimes, a defendant learned of shocking conduct — whether an act of infidelity or otherwise — and a jury could conclude that the shock of that discovery could so overwhelm a reasonable person that a lesser degree of culpability should be attached to his or her actions.[21] Thus, in determining whether to instruct the jury on voluntary manslaughter, a trial court would be

---

[21] I am flummoxed by the dissent's suggestion that the majority and I have articulated a standard that would require a voluntary manslaughter charge "in every domestic-violence related homicide case, regardless of whether the defendant said that he thought his partner had cheated on him just before the killing occurred and even if the evidence clearly shows that she had not." And I reject the characterization that either the majority or I have articulated a standard that turns on whether a "defendant reasonably believed the deceased had at some point had sex with someone else." A static belief that your intimate partner has "at some point had had sex with someone else" is not suggested as a basis for a charge. These are arguments against a standard I don't see articulated in the majority or this concurrence. Rather, the question is clearly linked here and in the majority to the moments immediately following a shocking discovery or revelation. I'm simply not sure how to square this contention by the dissent. Either the defense can point to slight evidence of a serious provocation, or it cannot. It would be a wild departure from our practice to allow trial courts to withhold charges supported by slight evidence.

wise to focus its analysis to the quality of the evidence — that is, whether the provocation at issue is of such a quality as to warrant the instruction — and beyond confirming that slight evidence exists, resist the temptation to assess the sufficiency of the alleged provocation or the reasonableness of the defendant's response to that provocation. And in close cases like this one, it seems that it would be prudent to err on the side of giving the requested instruction.[22]

---

[22] While the dissent complains about the breadth of my reading of the law, it seems to me that the dissent's reading of that same law is too narrow. Indeed, the dissent's position attempts to reshape our shocking disclosure precedent into merely another subset of sexual infidelity cases. But, it is not merely sexual infidelity or taunting about sexual infidelity that has been deemed sufficient to require a charge on voluntary manslaughter. See, e.g., *Scott*, 291 Ga. at 157-158. The dissent's reading of the caselaw does not appear to account for that reality nor explain how its reading of the sexual infidelity cases fits within a broader understanding of the statute as applied to other factual scenarios.

BOGGS, Chief Justice, dissenting.

The majority's expanded theory of voluntary manslaughter in the context of this domestic violence-related murder has never been the law in Georgia. For over a century, our precedent in this context has held that for the circumstances to cause a reasonable person to lose all self-control and thus warrant a charge on voluntary manslaughter, the defendant must catch his significant other actually in the act of sexual relations or in circumstances "indicat[ing] with reasonable certainty to a rational mind" that sexual intercourse had "just then" occurred. *Mays v. State*, 88 Ga. 399, 403-404 (14 SE 560) (1891). That standard is eviscerated under the standard the majority applies today, where nearly every defendant who kills a spouse, boyfriend, or girlfriend (and that person's lover) in the future could have the jury charged on, and thus both murders reduced to, voluntary manslaughter. That is true even if, as here, the defendant never says that he thought his partner had

committed sexual infidelity just before the homicide occurred, and where there was direct evidence that the parties had *not* just engaged in such activity. For these reasons, I respectfully disagree that this is a proper reading and application of our precedent, and because any instructional error here was also harmless in light of the overwhelming evidence of guilt, I respectfully dissent.

The facts, briefly, are as follows. Approximately two months before Appellant beat Treston Smith to death, Appellant heard that his fiancée Tia and another woman had been in a car with Smith after a party one night. Based on this rumor, Appellant confronted Tia and said if she was "messin' around," they should go their separate ways. Tia denied being with Smith. A few months later, Appellant stopped at a gas station, where tractor-trailers regularly parked, early one morning after work to adjust his rattling vehicle window. As he turned around behind the gas station, he saw Tia sitting fully clothed in the driver's seat of her car during her normal commute time. Smith, with his back turned and fully clothed, was a few paces away from the car walking in the opposite direction.

Appellant hit Tia's car window and cursed at her. Tia drove off without saying anything to Appellant. Appellant followed Smith, asking if something was "going on" between Tia and Smith. Smith cursed at Appellant, "smirked" at him, asked "what?", and said that "something was going on between" Tia and Smith. Smith punched Appellant once; then Appellant beat and kicked Smith, left, and returned to kick Smith in the head as Smith remained motionless on the ground, ultimately killing him.

The majority's view is that these circumstances reasonably caused Appellant to believe that Tia had been unfaithful sometime in the past and that our law accepts that the disclosure of sexual infidelity is serious provocation that would excite a sudden, violent, and irresistible passion in a reasonable person. The majority's view is wrong. Our case law has long held that for sexual infidelity to warrant a voluntary manslaughter instruction, a defendant must have caught his partner in the act of sexual intercourse or in circumstances "indicat[ing] with reasonable certainty to a rational mind" that his partner had "just then" had sex with someone else.

*Mays*, 88 Ga. at 403-404. This case law holds that mere words are insufficient to support the giving of a voluntary manslaughter instruction, except when those words involve taunting related to sexual infidelity — a circumstance not present here.

1. *The trial court properly refused to instruct the jury on voluntary manslaughter.*

**A. What the controlling law is**

OCGA § 16-5-2 (a) provides:

A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person; however, if there should have been an interval between the provocation and the killing sufficient for the voice of reason and humanity to be heard, of which the jury in all cases shall be the judge, the killing shall be attributed to deliberate revenge and be punished as murder.

Contrary to the majority's interpretation, the voluntary manslaughter statute does not say that "the jury in all cases shall be the judge" of the reasonableness of the killing of another person; it says that "the jury in all cases shall be the judge" of whether the

58

"interval" between the provocation and the homicide was "sufficient for the voice of reason and humanity to be heard." OCGA § 16-5-2 (a). Otherwise, a trial court would be required to instruct on voluntary manslaughter in virtually every domestic-violence related homicide trial. This is not consistent with Georgia law.

The General Assembly has set forth the *legal* standard for "serious provocation" that may mitigate a killing to the lesser offense of voluntary manslaughter: "serious provocation" must be "sufficient to excite [a sudden, violent, and irresistible] passion in a *reasonable person*." OCGA § 16-5-2 (a) (emphasis supplied).[23] In construing OCGA § 16-5-2 (a)'s language, we have consistently reiterated that "it is a question of law for the courts to determine whether the defendant presented any evidence of sufficient

---

[23] A person convicted of voluntary manslaughter may be sentenced to as little as one year imprisonment and to a maximum of twenty years imprisonment, and, if sentenced to the maximum, may be considered for parole after serving thirteen years. See OCGA § 16-5-2 (a); OCGA § 42-9-40; Ga. Comp. R. & Regs., r. 475-3-.05 (10). Of course, murder is punishable by "death, . . . imprisonment for life without parole, or . . . imprisonment for life," OCGA § 16-5-1 (e) (1), and requires that a defendant serve a minimum of 30 years before parole eligibility. See OCGA § 17-10-6.1 (c); OCGA § 42-9-39 (c).

provocation to excite the passions of a reasonable person."[24] *Ware v. State*, 303 Ga. 847, 850 (815 SE2d 837) (2018) (cleaned up). See also *Wilkerson v. State*, 317 Ga. 242, 247 (892 SE2d 737) (2023); *Pace v. State*, 258 Ga. 225, 225 (367 SE2d 803) (1988). Simply put, this is an objective measure of the adequacy of the provocation or cause by reference to the ordinary or reasonable person and does not, as the majority says, involve any question for the jury until a trial court has determined that the provocation or cause is sufficient. That is the sole question in this case, not, as the majority would have it, how a jury would make a reasonableness determination once a jury has been charged on voluntary manslaughter. When a trial court makes that legal determination, the question is whether a defendant's passion under the circumstances is broadly characteristic of a reasonable person or merely idiosyncratically attributable to the defendant. See *Jivens v. State*, 317 Ga. 859, 861-862 (896 SE2d 516)

---

[24] Applying this legal standard, as our case law requires, does not evidence, as the majority suggests, a disregard for a foundational part of our judicial system — the right to trial by jury. See U.S. Const. amend. VI; Ga. Const. of 1983, Art. I, Sec. 1, Par. XI.

60

(2023) (describing the objective voluntary manslaughter standard where "the reasonable person remains our barometer" and "we put aside any peculiar response the defendant may have had" (cleaned up)). See also *Annunziata v. State*, 317 Ga. 175, 179 (891 SE2d 814) (2023) (explaining that serious provocation "is an objective standard, and we must evaluate the alleged provocation evidence with respect to its effect on a reasonable person, putting aside any peculiar response Appellant may have had" (cleaned up)). This objective standard, which looks to the reactions of a *reasonable* person, is consistent with the notion that in Georgia, a reasonable person is expected to ordinarily control his emotions and not to react in a murderous rage upon discovering one's romantic partner in circumstances that might raise mere suspicions about her faithfulness. See *Jivens*, 317 Ga. at 862 (pointing out that "there is a difference between slight evidence of serious provocation and evidence — even strong evidence — of lesser provocation"); *Johnson v. State*, 297 Ga. 839, 842 (778 SE2d 769) (2015) ("The voluntary manslaughter statute establishes an objective standard; the

61

provocation required to mitigate malice is that which would arouse a heat of passion in a *reasonable* person, and it is of no moment whether the provocation was sufficient to excite the deadly passion in the particular defendant." (cleaned up; emphasis in original)). See also 2 Wayne R. LaFave, Substantive Criminal Law § 15.2 (b) (3d ed. Oct. 2023 update) ("What is really meant by reasonable provocation is provocation which causes a reasonable man to lose his normal self-control; and, although a reasonable man who has thus lost control over himself would not kill, yet his homicidal reaction to the provocation is at least understandable." (cleaned up)).

In setting forth the legal standard of serious provocation in the context of adultery, we have long held that

> in order to reduce the crime from murder to manslaughter, it is necessary it should be shown that the prisoner found the deceased in the very act of adultery with his wife. I do not mean to say that the prisoner must stand by and witness the actual copulative conjunction between the guilty parties. If the prisoner saw the deceased in bed with the wife, or saw him leaving the bed of the wife, or if he found them together in such a position as to indicate *with reasonable certainty to a rational mind* that they had just then committed the adulterous act, it will be sufficient to satisfy the requirements of the law in

62

this regard[.]

*Mays*, 88 Ga. at 403 (cleaned up; emphasis supplied) (affirming conviction for voluntary manslaughter where the defendant, upon coming home one night, looked through a window, saw a naked man step out of a bedroom in the defendant's home, and fatally shot the man). See also *Baker v. State*, 111 Ga. 141, 142-143 (36 SE 607) (1900) (applying *Mays*'s standard to hold that no voluntary manslaughter instruction was warranted, because the defendant did not find "his wife in the very act of adultery, or under such circumstances as to indicate that she had just committed the adulterous act"). Mere suspicion or disclosure of past adultery is not enough, and the majority fails to explain why the mountain of case law contrary to its holding does not control the outcome here. See, e.g., *Tepanca v. State*, 297 Ga. 47, 49-50 (771 SE2d 879) (2015) (holding that the trial court did not err in failing to instruct the jury on voluntary manslaughter, because as a matter of law the defendant's "sexual jealousy was based wholly on supposition"); *Parks v. State*, 234 Ga. 579, 581-582 (216 SE2d 804) (1975) (holding

that the defendant finding his ex-girlfriend sitting on a sofa with a man in her apartment was "not evidence of anything approaching sufficient passion or provocation to warrant a charge on the law of voluntary manslaughter"); *Ware*, 303 Ga. at 850-851 (holding that "statements by a victim that she wants to end the relationship, is involved with or prefers the affections of another, or even has chosen to leave the defendant for another — but that stop short of disclosing extra-relationship sexual conduct — have never been deemed" to be serious provocation to require a voluntary manslaughter instruction).

Additionally, words alone are generally not seriously provocative. See *Rountree v. State*, 316 Ga. 691, 694-695 (889 SE2d 803) (2023). See also *Mack v. State*, 272 Ga. 415, 416, 418 (529 SE2d 132) (2000) (holding that the trial court did not err in instructing the jury that words alone could not be serious provocation where, "according to [the defendant's] tape-recorded statement, the victim called him names, cursed him, laughed at him, and derided his physique" by "comparing the size of his penis unfavorably with that

of another man," "but there was no evidence that the victim had recounted her sexual involvement with other persons, or that she bragged about her sexual activities with another gentleman" (cleaned up)). And although there is a single, narrow exception to the words-alone rule, it does not apply here. See *Ware*, 303 Ga. at 849-850 (explaining that "we have recognized . . . *a limited exception* to this rule for words informing a defendant of adulterous conduct. *In that one circumstance*, we have held that words alone may constitute . . . serious provocation . . . . But as those cases and other decisions of this Court have made clear, in order for the conduct communicated by such words [alone] to amount to the sort of provocation necessary to reduce a murder to manslaughter, they must disclose adulterous conduct" (cleaned up; emphasis supplied)).[25] For example, in *Ware*, we held that the defendant was

---

[25] *Scott v. State*, 291 Ga. 156 (728 SE2d 238) (2012), affirmed that "we adhere to the view that words alone, regardless of the degree of their insulting nature, will not in any case justify the excitement of passion so as to reduce the crime from murder to manslaughter." Id. at 158 (cleaned up). *Scott*, however, held that "the victim's words *in connection with his conduct* served as the serious provocation sufficient to excite a sudden, violent and irresistible passion." Id. (cleaned up; emphasis supplied)).

not entitled to a voluntary manslaughter instruction where his wife told him that she was seeing someone else that she loved and that she could no longer love the defendant. See 303 Ga. at 848-852. She also asked him "if he had been having any issues downstairs" after he found a receipt from a Florida hospital under their mattress at a time when he was unaware that his wife had gone to Florida. See id. at 848-849. He then learned that his wife had been experiencing "female issues" due to a new prescription that the Florida hospital gave her. See id. at 848-849 (cleaned up). Clearly, if Appellant had a reasonable belief that Tia had been sexually unfaithful, Ware would have, too. But we held that Ware was not entitled to a voluntary manslaughter instruction. See id. at 849-852. The cases in which we have held that the disclosure of sexual infidelity was sufficient to warrant a voluntary manslaughter charge involved extreme circumstances not remotely similar to these facts. For example, in *Brooks v. State*, 249 Ga. 583 (292 SE2d 694) (1982), we held that a voluntary manslaughter instruction was warranted where the victim "taunt[ed] [the defendant] with a graphic

66

description of her sexual activities with other men" and "bragg[ed] about her sexual activities with another gentleman." Id. at 585 (cleaned up). In *Strickland v. State*, 257 Ga. 230 (357 SE2d 85) (1987), where the defendant did receive a voluntary manslaughter charge but argued on appeal that a limiting instruction the trial court gave related to expert testimony was erroneous, we said in dicta that evidence that the victim "recount[ed] her sexual involvement with other persons" to him, just after the defendant and victim had sex and talked about reconciling, warranted a voluntary manslaughter charge. Id. at 231-232 & n.2. Relatedly, in *Raines v. State*, 247 Ga. 504 (277 SE2d 47) (1981), we held that the trial court should have instructed the jury on voluntary manslaughter where the paralyzed defendant's "wife was carrying a letter she had written to her boyfriend and upon her husband's discovery of it not only admitted her adultery but taunted him with it as well as with degrading comments about his disability." Id. at 506. Those cases do not resemble Appellant's situation.

In short, the status of Georgia law completely disregarded by

the majority is that only after a trial court concludes that specific circumstances could constitute serious provocation as a matter of law does a jury decide whether the evidence supports the conclusion that a defendant was seriously provoked in a particular case. The trial court properly made that legal determination here.

**B. What the controlling law is not**

All the foregoing cases concern the role of judges as gatekeepers in determining whether a voluntary manslaughter charge must be given to the jury. See, e.g., *Tepanca*, 297 Ga. at 49-50; *Mays*, 88 Ga. at 403-404. The majority does not address these cases. Instead, the majority dismisses them, saying that I am trying to keep reasonableness questions away from a jury. But that is not so. Based on the text of the statute, these cases require a trial court to determine as a matter of law whether the victim's conduct that the defendant alleges was provocative was the type of "serious provocation sufficient to excite [a killing] passion in a reasonable person." OCGA § 16-5-2 (a). If a defendant offers even slight evidence of such serious provocation, he is entitled to a voluntary

manslaughter charge. See *Ware*, 303 Ga. at 850. To conclude that I am wrong about this gatekeeping role of a trial court, the majority cites *Anderson v. State*, 248 Ga. 682 (285 SE2d 533) (1982), *Smith v. State*, 280 Ga. 161 (625 SE2d 766) (2006), and *Elrod v. McConnell*, 170 Ga. 892 (154 SE 449) (1930), saying that reasonableness determinations are for the jury. Those cases do not apply here. The portion of *Anderson* from which the majority quotes addressed the constitutional sufficiency of a defendant's murder conviction, see 248 Ga. at 683; *Smith* did not mention voluntary manslaughter at all, see 280 Ga. at 161-163; and *Elrod* was not even a criminal case. See 170 Ga. at 892-893. If the majority is correct that reasonableness determinations are always for a jury, that rule disregards and conflicts with our numerous cases holding that various types of provocative conduct are insufficient to warrant a voluntary manslaughter charge. See, e.g., *Ward v. State*, 2024 WL 1862343, at *6-7 (Case No. S24A0352, Apr. 30, 2024).[26]

---

[26] While the majority says that we should look to the text of a statute, and changes to the text, to determine a statute's meaning, it implies that the

Moreover, the adultery cases that the majority cites do not support its argument either. *Soto v. State*, 303 Ga. 517 (813 SE2d 343) (2018), is not a case about whether a voluntary manslaughter charge should have been given. There, the jury was charged on voluntary manslaughter but convicted the defendant of malice murder, and on appeal, the defendant argued that as a matter of constitutional due process the evidence supported a conviction for

---

Model Penal Code provision on voluntary manslaughter should inform the meaning of voluntary manslaughter law in Georgia, particularly to diminish a trial court's role in making the objective determination of provocation required by our statute. The majority does so despite the fact that the MPC provision contains vastly different text than our voluntary manslaughter statute. The MPC provision has been said to provide a "new, far broader vision" of voluntary manslaughter law than the type of heat-of-passion law represented by OCGA § 16-5-2 (a). Joshua Dressler, *Why Keep the Provocation Defense?: Some Reflections on A Difficult Subject*, 86 MINN. L. REV. 959, 960 (2002). In adopting the MPC test, "the drafters qualified the rigorous objectivity of the common law. The common law formulation measures the adequacy of a provocation according to its effect on a reasonable person. . . . The Model Penal Code, in contrast, directs the jury to consider the reasonableness of the defendant's conduct from the viewpoint of a person in the actor's situation. This formulation was intended to introduce a larger element of subjectivity into the doctrine." Dan M. Kahan & Martha C. Nussbaum, *Two Conceptions of Emotion in Criminal Law*, 96 COLUM. L. REV. 269, 321 (1996) (cleaned up). The MPC provision has been said to have "dysfunction inherent" in it; its test "becomes indeterminate and results in excusing serious homicides from being treated properly as murders, when applied to real cases." David Crump, *"Murder, Pennsylvania Style": Comparing Traditional American Homicide Law to the Statutes of Model Penal Code Jurisdictions*, 109 W. VA. L. REV. 257, 318-319 (2007).

voluntary manslaughter only, because he became enraged after seeing the woman he loved embrace and kiss another man. See id. at 519. In holding that "it is for the jury to determine whether the actions alleged to have provoked the defendant actually occurred and whether these actions were sufficient provocation to excite the deadly passion of a reasonable person," id., we correctly refused to second-guess the jury's determination of the adequacy of the serious provocation that the trial court determined was present. But *Soto* decided nothing about a trial court's authority as an initial matter to decide whether the evidence showed "serious provocation sufficient to excite such passion in a reasonable person." OCGA § 16-5-2 (a). Likewise, *Lynn v. State*, 296 Ga. 109 (765 SE2d 322) (2014), did not hold that the mere disclosure of past infidelity warrants a voluntary manslaughter charge. In that case, the jury was charged on voluntary manslaughter, and the only question on appeal was whether the trial court erred in excluding evidence that arguably supported the defendant's testimony about provocative disclosures his wife made in the argument that immediately preceded the

71

killing. See 296 Ga. at 111-112. Similarly, *Lawson v. State*, 280 Ga. 881 (635 SE2d 134) (2006), addressed the constitutional sufficiency of the evidence supporting a defendant's convictions; see id. at 882; *Jones v. State*, 314 Ga. 692 (878 SE2d 502) (2022), addressed the constitutional sufficiency of a defendant's felony murder conviction where the jury was instructed on, and the defendant argued on appeal that he was only guilty of, voluntary manslaughter, see id. at 694-696; *McGuire v. State*, 307 Ga. 500 (837 SE2d 339) (2019), involved a defendant who argued that the State did not exclude the reasonable hypothesis that he acted based upon serious provocation where the jury was charged on voluntary manslaughter but rejected that defense and convicted him of malice murder, see id. at 503-505; and *Moses v. State*, 270 Ga. 127 (508 SE2d 661) (1998), discussed the alleged error of a jury charge about the relationship between malice and serious provocation. See id. at 130. None of these cases involve the reversal of a murder conviction due to the trial court's failure to instruct on voluntary manslaughter.

The voluntary-manslaughter-instruction cases the majority

cites fare no better. In *Clough v. State*, 298 Ga. 594 (783 SE2d 637) (2016), we reversed for failure to instruct on voluntary manslaughter where, among other things, the defendant broke into his mother-in-law's house and found his wife and the victim in bed together, but that case does not control here for at least three reasons. See id. at 594-597.[27] First, *Clough* involved a defendant who found his spouse in bed with another man. See id. at 595. Second, the portion of *Clough* that the majority quotes cited *Goforth v. State*, 271 Ga. 700 (523 SE2d 868) (1999). In *Goforth*, we pointed to the compromising situation that "at the time of the homicide [the victim] was in the bedroom . . . engaging in an act of consensual sex" with

---

[27] In *Clough*, the Court did not grapple with whether the defendant's breaking into the house to kill the victim meant that his passion was not statutorily "sudden" or address whether the instructional error harmed the defendant. See 298 Ga. at 595-598. In that case, Clough and his wife were estranged and had been separated for months. See id. at 594-595. Clough's wife had been staying with her mother part of the time. See id. On the night of the homicide, Clough broke into his mother-in-law's house after seeing vehicles owned by the victim parked outside, and he stabbed the victim to death upon finding him in bed with his wife. See id. Clough also committed aggravated assault against his wife and his mother-in-law. See id. at 594-595 & n.1. The Court may have opted not to address harmlessness given the determination that the trial court was authorized to re-sentence Clough for felony murder premised on burglary. See id. at 598. Nonetheless, any doubts I may have about *Clough* need not be resolved today, because it is clearly distinguishable.

73

the defendant's former girlfriend. Id. at 700-701. At trial, the jury was instructed on voluntary manslaughter but convicted the defendant of malice murder, and on appeal, the defendant contended that he was only guilty of voluntary manslaughter. See id. at 701. We again rightly held in *Goforth* that it was for the jury to find whether the evidence showed that the defendant was guilty of voluntary manslaughter or murder but said nothing about the standard for jury instructions in this context. Third, *Goforth* had nothing to do with the issue in *Clough* — whether a voluntary manslaughter instruction was warranted — and should not have been the authority to which the Court turned in that case. Accordingly, *Clough* and *Goforth* are irrelevant here. Additionally, in *Richardson v. State*, 189 Ga. 448 (5 SE2d 891) (1939), we held that a defendant was entitled to a voluntary manslaughter instruction where she saw the victim "lay on the ground with [the defendant's husband]" "behind some bushes" in an empty lot at

74

night. Id. at 448-449.[28] Knowing that a voluntary manslaughter instruction is warranted when a defendant discovers his partner lying down with someone else in bed or in some other secluded area[29] says nothing about whether one is warranted when a defendant sees his partner, fully clothed, in the driver's seat of a car and a rumored paramour walking near the car, at the normal commute times for both people. Similarly, the majority's discussion of *Ware* is incomplete. As I pointed out above, the victim's words in that case all but said that the victim was having an affair, but we still held that they did not require a voluntary manslaughter charge. See *Ware*, 303 Ga. at 848-852. If Appellant here held a reasonable belief

---

[28] In *Richardson*, the Court determined that the error in refusing to instruct on voluntary manslaughter was not rendered harmless by a charge on the then-existing principle that "where a wife catches her husband in the act of adultery with another woman, . . . she would have the right to kill such woman." 189 Ga. at 449. That principle of law was later abrogated. See *Burger v. State*, 238 Ga. 171, 171-172 (231 SE2d 769) (1977) (describing justifiable homicide instruction in such circumstances as "uncivilized," and holding that it was no longer authorized when a defendant kills in order to prevent the completion of adultery).

[29] Despite our euphemistic language in *Richardson*, the appellate record in that case shows that the defendant stated she found her husband and the victim "having intercourse," that her husband was "on top of" the victim, and that her husband "had his pants down."

about Tia's sexual infidelity, surely Ware did, too.

In addressing why Appellant's belief was reasonable, the majority asserts that Smith's smirk constituted slight evidence of taunting. A smirk does not even remotely rise to the level of "taunting" about sexual conduct in the way that our mere-words precedent uses that word. For example, we use the word "taunting" to describe graphic descriptions of sexual intercourse with others, see *Brooks*, 249 Ga. at 585-586, recounting one's sexual encounters with others immediately after sex with one's own partner and a proposed reconciliation, see *Strickland*, 257 Ga. at 231-232, telling a paralyzed man that he was "half a man," "no good," and could not have sexual intercourse with his partner the way that others did, *Raines*, 247 Ga. at 505-506, or telling a family member, who suspects the victim of molesting the family member's minor niece, that "she's my b——, I can do whatever I want." *Scott v. State*, 291 Ga. 156, 157-158 (728 SE2d 238) (2012). A smirk falls far short of that standard.

In conclusion, by relying on this inapposite case law, the

majority holds that Appellant was entitled to a voluntary manslaughter instruction because a reasonable person could conclude under the circumstances that Appellant reasonably believed Tia and Smith had, *at some time prior to the killing*, had sex. The majority's new standard has the practical effect of transforming the legal question of what constitutes serious provocation into a factual one that a jury resolves and thus eliminating the role of a trial judge to decide questions of law.[30] This new standard is such a low one that it basically does not exist at all.

### C. How the majority's view makes Georgia an outlier

The majority's new standard also makes Georgia an outlier among our sister states, which require more than a reasonable belief

---

[30] On this same point, the concurrence's suggestion that a "sufficiently shocking" "dramatic disclosure" can warrant a voluntary manslaughter charge finds no support in our case law and is equally as broad as the majority's new standard. Additionally, I do not see how that standard is useful to a trial court that is trying to decide whether an instruction is warranted during the heat of a charge conference. Finally, the concurrence's advice to trial courts not to "assess the sufficiency of the alleged provocation or the reasonableness of the defendant's response" runs contrary to the plain language of OCGA § 16-5-2 (a) and our longstanding case law requiring trial courts to determine as a matter of law whether the alleged serious provocation is sufficient to excite a sudden, violent, and irresistible passion in a reasonable person.

that a partner has been sexually unfaithful at some prior time in order to warrant a voluntary manslaughter instruction. See *State v. Simonovich*, 688 SE2d 67, 71 (N.C. App. 2010) ("When one spouse kills the other in a heat of passion engendered by the discovery of the deceased and a paramour in the very act of intercourse, or under circumstances clearly indicating that the act had just been completed, or was severely proximate, and the killing follows immediately, it is manslaughter. However, a mere suspicion, belief, or knowledge of past adultery between the two will not change the character of the homicide from murder to manslaughter." (cleaned up)); *Knight v. State*, 907 S2d 470, 479 (Ala. Crim. App. 2004) ("Based on over 100 years of precedent we hold that no instruction on heat-of-passion manslaughter was warranted in this case because [the defendant] did not catch his wife in the act of adultery."); *State v. Cooley*, 536 SE2d 666, 668 (S.C. 2000) (explaining that "in general, South Carolina has allowed marital infidelity to support a charge of marital voluntary manslaughter only when the killer finds the other spouse and paramour in a guilty

78

embrace or flagrantly suggestive situation," and noting a narrow exception where a husband, who believes that his wife has been repeatedly, violently raped, is taunted by the believed-to-be rapist (cleaned up))[31]; *State v. John*, 30 N.C. 330, 336 (1848) ("A belief — nay, a knowledge, by the prisoner, that the deceased had been carrying on an adulterous intercourse with his wife, cannot change the character of the homicide. . . . It is the sudden fury excited by finding a man in the very act of shame with his wife, which mitigates the offence of the husband, who kills his wrongdoer at the instant; but to the offence of one, who kills upon passion, excited by a less cause — by a mere belief of the act — the law allows of no mitigation."). See also 40 CJS Homicide § 119 (Mar. 2024 update) ("The killing of a spouse or the spouse's paramour in a heat of passion resulting from discovering them in the act of adultery is

---

[31] Contrary to the majority's suggestion, *Cooley* does not support the giving of a voluntary manslaughter charge here. In that case, the Supreme Court of South Carolina held that no voluntary manslaughter instruction was warranted even though the defendant subjectively believed that his wife was having an affair, because there was "no allegation that [the defendant] actually encountered [his wife] in an adulterous situation." *Cooley*, 536 SE2d at 668-669. Neither did Appellant.

manslaughter, but it is not generally manslaughter where the passion is based on mere suspicion[.]"). See also 2 Wharton's Criminal Law § 22:5 (16th ed. Sept. 2023 update) ("In order to reduce a homicide from murder to voluntary manslaughter, there must be provocation, and such provocation must be recognized by the law as adequate." (cleaned up)); Note, *Manslaughter and the Adequacy of Provocation: The Reasonableness of the Reasonable Man*, 106 U. PA. L. REV. 1021, 1023 (1958) (observing 60 years ago that "the criminal courts refuse to consider the application of a subjective test in determining the adequacy of provocation" (cleaned up)).

This new standard also departs significantly from the common law. See *Manning's Case*, 83 Eng. Rep. 112, 112 (1671) (holding that a defendant committed voluntary manslaughter when the defendant killed the victim upon discovery of the victim "committing adultery with his wife in the very act"); 2 Wharton's Criminal Law § 22:11 (16th ed. Sept. 2023 update) (observing that "a bare suspicion of the spouse's adultery was not deemed adequate provocation" at common

80

law (cleaned up)); 4 William Blackstone, Commentaries on the Laws of England 191-192 (noting that a defendant who "takes another in the act of adultery with his wife, and kills him directly upon the spot" committed common-law voluntary manslaughter); 1 Matthew Hale, Historia Placitorum Coronae: The History of the Pleas of the Crown 486 (1736) ("A. commits adultery with B. the wife of C. who comes up and takes them in the very act, and . . . kills the adulterer upon the place, this is manslaughter[.]"). Cf. also *Regina v. Kelly*, 175 Eng. Rep. 342, 342 (1848) (explaining that a husband killing his wife merely because he suspected her of adultery, no matter how strong his suspicion, is murder).

**D. Why the facts here do not require a voluntary manslaughter charge**

The majority describes what Appellant saw as a compromising situation that prompted a reasonable belief of Tia's sexual infidelity. Catching a partner in a *compromising situation* is not the applicable standard, even if the situation raises suspicions in one's mind as to the partner's faithfulness. As explained above, the "compromising

situation" language appears in a portion of *Goforth* where we discussed the constitutional sufficiency of the evidence of the defendant's malice murder conviction. See 271 Ga. at 701. Appellant did not witness Tia and Smith having sex that morning, nor was there any evidence that Appellant thought they did. To the contrary, Appellant observed Smith, fully clothed, walking away from Tia's car, where Tia was sitting in the driver's seat, fully clothed, during Tia's normal commute time. Appellant said that he "put two and two together," that he thought "it's really true," and that Tia looked at him as if she had "been caught." What did he put together? What was true? What did he think he caught her doing? The rumor Appellant heard was that Tia went riding around town in a vehicle after a party one night with another female and Smith. Appellant never claimed to have thought that Tia and Smith had ever had sex, much less that they did so that morning. Nevertheless, the majority holds that the trial court should have considered something Appellant never said as slight evidence supporting voluntary manslaughter when deciding how to instruct the jury. I may tend to

82

agree with the majority that Appellant's discovery suggested Tia had developed a romantic relationship with Smith, but this would not "indicate with reasonable certainty to a rational mind" that Tia and Smith had "just then" had sex, which is what voluntary manslaughter demands. *Mays*, 88 Ga. at 403-404. Appellant never said, in his statement to police or his trial testimony, that he thought Tia and Smith were having sex that morning. Indeed, even if Appellant had said that he thought that Tia and Smith were having an affair, that statement alone would not entitle him to a voluntary manslaughter charge. See *Tepanca*, 297 Ga. at 49-50.

In addition, words alone, let alone Smith's smirk or Tia's allegedly guilty facial expression, do not constitute serious provocation. See *Ware*, 303 Ga. at 850 ("We have long held that words alone, regardless of the degree of their insulting nature, will not in any case justify the excitement of passion so as to reduce the crime from murder to manslaughter where the killing is done solely on account of the indignation aroused by use of opprobrious words." (cleaned up)). Smith's comments to Appellant — "f**k you," "what?",

and "something was going on between" Tia and Smith — do not come close to fitting the words-alone exception because Smith did not tauntingly detail Tia and Smith's sexual encounters to Appellant. See *Ware*, 303 Ga. at 850-851; *Brooks*, 249 Ga. at 585-586; *Raines*, 247 Ga. at 506. This would be true even if Smith had said he and Tia previously slept together. See *Humphreys v. State*, 175 Ga. 705, 708-709 (165 SE 733) (1932); *Stevens v. State*, 137 Ga. 520, 521-522 (73 SE 737) (1912).

Lastly, adding the words and conduct together leads to no different result. No one ever told Appellant that Tia and Smith had sex, Appellant did not see them having sex, and seeing Smith, fully clothed, walking near Tia's car would not indicate with reasonable certainty that they had just finished doing so. As a matter of law, Appellant was not entitled to a voluntary manslaughter instruction. See, e.g., *Tepanca*, 297 Ga. at 49-50 (reasoning that the trial court did not err in failing to instruct the jury on sexual jealousy, because the defendant's "sexual jealousy was based wholly on supposition"); *Culmer v. State*, 282 Ga. 330, 335 (647 SE2d 30) (2007) (holding that

the trial court did not err in failing to instruct the jury on voluntary manslaughter where the State presented evidence that the defendant discovered e-mails showing that the victim "was involved with another man, and killed her for it," because "the evidence adduced by the State did not show [the defendant] had learned of [sexually unfaithful] conduct immediately prior to the killing or that the victim recounted it to [the defendant] at the time of her killing so that the provocation might cause a sudden passion" (cleaned up)); *Stewart v. State*, 234 Ga. 3, 5 (214 SE2d 509) (1975) (holding that there was "no evidence of provocation sufficient to reduce the intentional homicide to voluntary manslaughter" where the defendant argued that he was seriously provoked due to the combination of various circumstances, including "the fact that his wife had been with [the victim] on the night of the murder and for several previous nights and [the defendant] viewed them in the car together immediately prior to the murder"); *Key v. State*, 211 Ga. 384, 385-386 (86 SE2d 212) (1955) (holding that there was no error in refusing to give a voluntary manslaughter charge where "there

was no evidence in the record from which the jury could have determined that the accused was guilty" of that offense, and describing the evidence as showing "merely that [the defendant's] wife, who was separated from him, was sitting at a table in a restaurant with the deceased at the time of the shooting"); *Humphreys*, 175 Ga. at 708-709 (reaffirming that "if a wife had been suspected by her husband of infidelity, and some little time thereafter she stated to him that [she] had been guilty of adultery, and expressed an intention to see her paramour again, and if thereupon her husband seized a gun and killed her, such facts were not sufficient . . . to authorize submission to the jury of the theory of voluntary manslaughter, though a charge on that subject was requested" (cleaned up)); *Stevens*, 137 Ga. at 521-522 (first announcing the holding that *Humphreys* reaffirmed); *Baker*, 111 Ga. at 142-143 (holding that the trial court did not err in failing to instruct the jury on voluntary manslaughter where the defendant saw his wife in bed with a man two days before the homicide and, at the time of the homicide, saw the man "with his hands around [the

defendant's wife's] neck, kissing her," because the circumstances did not indicate that they were in the act of adultery or had just finished having sex).

To see the practical and concerning results of the majority's view, consider these two hypotheticals. Suppose that Vickie and Daryl have been dating for a few months. Daryl is quite the jealous type. He learns that Vickie has an assigned cubicle at work next to a male co-worker named Leonard. Daryl asks Vickie if she is carrying on an affair with Leonard, and Vickie says that she is not. Later that year, Vickie's office hosts a holiday party. At the party, Daryl walks across the ballroom to get a drink while Vickie freshens up in the restroom. Daryl waits in line and, a few minutes later, turns around to see Vickie returning from the hallway leading to the restroom, walking with Leonard, and laughing. Bursting with rage, Daryl yells at Vickie, asking what she was doing in the restroom. Fearful for her life, Vickie runs. Daryl assumes that if she is running from him, she must be guilty of sexual infidelity. He chases her down, tackles her, and strangles her to death. According to the

majority, these facts would demand a jury charge on voluntary manslaughter because a jury could find that Daryl might have reasonably believed Vickie had sex with Leonard at some time before the killing. That result, contrary to a century of precedent, establishes a concerning course in a country where approximately 34% of female murder victims are killed by their intimate partners. See Erica L. Smith, *Female Murder Victims and Victim-Offender Relationship, 2021*, Bureau of Justice Statistics (Dec. 1, 2022), https://bjs.ojp.gov/female-murder-victims-and-victim-offender-relationship-2021. See also Donna K. Coker, *Heat of Passion and Wife Killing: Men Who Batter/Men Who Kill*, 2 S. CAL. REV. L. & WOMEN'S STUD. 71, 91 (1992) (observing that "[a]pproximately 60% of men who kill their wives allege that she was sexually unfaithful" (cleaned up)).

Similarly, assume the same facts except that Daryl does not go to the holiday party. Instead, Vickie attends alone and, in a moment of romantic intrigue, has sex with Leonard. The next day, Vickie confesses to Daryl that she has cheated on him. Daryl becomes

enraged and fatally shoots her on the spot. According to the majority, Daryl should receive a voluntary manslaughter instruction because Vickie disclosed her sexual infidelity. But see *Ware*, 303 Ga. at 850-851; *Humphreys*, 175 Ga. at 708-709; *Stevens*, 137 Ga. at 521-522.

In sum, the trial court properly refused to instruct the jury on voluntary manslaughter based on our longstanding precedent, and I cannot endorse the majority's newly created and broad standard effectively relegating all future domestic violence-related murders to voluntary manslaughter upon the notion that some jury may believe, based wholly on supposition, that the defendant reasonably believed the deceased had at some point had sex with someone else. For trial courts across this State, the lesson to learn from the majority opinion (and the concurrence) is that a voluntary manslaughter instruction should be given in *every* domestic-violence related homicide case, regardless of whether the defendant said that he thought his partner had cheated on him just before the killing

occurred and even if the evidence clearly shows that she had not.[32]

2. *Any instructional error was harmless.*

Moreover, even if everything that the majority says about voluntary manslaughter is right, which it most assuredly is not, I would still affirm because it is highly probable that any instructional error did not contribute to the verdict. See *Hatney v. State*, 308 Ga. 438, 441 (841 SE2d 702) (2020). The State introduced strong evidence of malice murder and aggravated assault; Appellant's testimony was contradicted by his statement to police and by the video evidence presented at trial; and Appellant's own version of events contradicted voluntary manslaughter. When determining whether a nonconstitutional error was harmless, we weigh the evidence as reasonable jurors, not by asking what a single juror may have thought about the evidence. See id. Although Appellant claimed at the beginning of his interview with the police a few hours

---

[32] I also note that the concurrence's standard differs from that of the majority; thus, it appears that the majority's novel standard only garnered the approval of a plurality of this Court.

after the homicide that he did not know what happened,[33] he went on to describe in detail what did. For example, Appellant recounted the time that he left work, the places he drove, the reason why he stopped at the gas station, and his conversation and altercation with Smith. Appellant maintained in his interview that he went home before driving to the gas station, but at trial on direct examination, he contradicted himself, claiming that he drove toward his home but turned around before arriving there. Appellant even told police that he did not "really care about what [Tia and Smith] had going on" but was upset that he had been deceived. And when police asked Appellant about Smith's reaction and if "the way [Smith] was acting toward[ ] [Appellant] like, kind of fueled [him] even more," Appellant said, "No," that he was just "hurt," that he "want[ed] answers," and

---

[33] In context, this statement is better understood to mean that Appellant did not know how Smith died — not that he couldn't remember beating and kicking Smith to death. Compare *Scott*, 291 Ga. at 157-158 (holding that a voluntary manslaughter instruction was warranted where, among other evidence, the defendant "stated he 'lost it,' 'blacked out,' and started shooting"). Moreover, I doubt that memory loss, by itself, strongly supports voluntary manslaughter. See *Mobley v. State*, 314 Ga. 38, 42-44 (875 SE2d 655) (2022) (holding that no evidence supported a voluntary manslaughter instruction, in part because the defendant "did not testify that he was provoked, angry, or inflamed," just "that he could not remember what happened").

that Smith was being "disrespectful" to him. See id. at 440-442 (reasoning, when explaining the harmlessness of an assumed error based on failure to instruct on voluntary manslaughter, that the defendant's self-described motives were "more demonstrative of deliberation than irresistible passion"). And Appellant did not mention in his interview with police that Smith stabbed him; he only claimed that at trial.

Furthermore, at trial when defense counsel asked Appellant if he saw "someone get out of [Tia's] car" when he drove behind the gas station (which Appellant claimed he "usually" did),[34] Appellant testified, "I seen like he — Yes, sir." But, surveillance videos flatly showed that Smith was already out of Tia's car and walking away when Appellant drove behind the gas station, and Appellant told police during his interview that Smith "wasn't in the car." Appellant went on in his testimony to deny running after Smith and kicking

---

[34] The jury had before it photos of the gas station, which showed that the gas station had two driveways off the road that allowed a person to enter the property at one driveway, drive between a set of gas pumps and the front of the store, and exit using the next driveway. Thus, driving behind the gas station to exit was unnecessary.

Smith in the face or head, despite surveillance videos and medical evidence plainly showing otherwise. And the jury heard evidence that after brutally beating Smith, kicking Smith in the head with steel-toed boots, and recognizing that Smith was unconscious, Appellant got into his vehicle, started to drive away, stopped, backed up, got out, and returned to kick Smith more. He did not call 911 to request medical attention for Smith or ask the gas station owner to do so.

Shortly after the killing, Appellant called family members to tell them that he "got in a fight." He did not, by contrast, tell them that he found Tia and Smith together immediately after they had sex, became homicidally angry, and had since calmed down. Compare *Scott*, 291 Ga. at 157-158 (focusing on evidence that the defendant said he "lost it" and "blacked out" at the time of the homicide, when holding that the trial court should have instructed the jury on voluntary manslaughter (cleaned up)). Nor did he tell them that Smith needed medical attention. Then, a few weeks later in jail, Appellant called a woman he described at trial as "[j]ust a

friend" of his from before the killing. On the jail call, which the State played at trial, Appellant referred to the woman as "baby," asked her to send him pictures, and made sexually suggestive remarks. The call destroyed Appellant's credibility because it suggested to the jury that Appellant had been sexually unfaithful to Tia, notwithstanding his claims at trial that he was working to improve their relationship and that Tia's conduct hurt him. The upshot of weighing all these contradictions is that reasonable jurors would have disregarded Appellant's story because it so wholly and unreasonably contradicted other evidence.

Lastly, even setting aside everything I just said about the unbelievability of Appellant's story and assuming that the jury credited his version of events, his own testimony singularly foreclosed the harmfulness of any error. He rejected a pretrial voluntary manslaughter plea deal, and consistent with that rejection, his testimony at trial focused on self-defense as his main defense. Cf. *McClure v. State*, 306 Ga. 856, 866-867 (834 SE2d 96) (2019) (Nahmias, P.J., concurring) (explaining, with respect to

94

affirmative defenses, that failing "to give an instruction on an alternative defense that is supported by only the slightest evidence and that is inconsistent with the defendant's own account of the events or with the main defense theory presented at trial" is likely harmless).[35] Even when defense counsel tried to get Appellant to testify about the overpowering passion that caused him to kill Smith, Appellant testified that he was not "vicious mad," did not intend to kill Smith, and acted in self-defense. For example, when defense counsel asked Appellant if he was angry, Appellant said, "I wasn't angry." Counsel immediately asked Appellant again, "Were

---

[35] This argument does not misunderstand then-Presiding Justice Nahmias's reasoning about the failure to instruct on alternative defenses. Failing to instruct on a defense or lesser offense the defendant himself contradicted will in most cases be harmless, regardless of whether the defendant's other defense was strong or weak. That is because reasonable jurors are unlikely to believe a defense that the defendant himself said did not apply to his actions. In the portion of then-Presiding Justice Nahmias's concurrence from which the majority quotes, he recognized the same point by using the word "or." See *McClure*, 306 Ga. at 866 (Nahmias, P.J., concurring) ("Presenting inconsistent defenses to the jury, particularly when the evidentiary support for one defense is considerably weaker than for others *or where a defense is contradicted by the defendant's own account of events*, risks losing credibility for all of the defenses." (emphasis supplied)). If then-Presiding Justice Nahmias thought that his reasoning only applied to situations where the defendant's other defense was strong, he would have used the word "and" or left out that second phrase completely.

you angry?" This time, Appellant said that he was but — inconsistent with voluntary manslaughter — downplayed it: "I wasn't like angry like vicious mad. I was just angry like asking questions." And Appellant did so when he still anticipated that the trial court would instruct on voluntary manslaughter. Weighing all the evidence as reasonable jurors would, I conclude that it is highly probable that the jury would still have found Appellant guilty of murder even if the trial court had given the requested jury instruction on voluntary manslaughter. See *Hatney*, 308 Ga. at 440-442 (holding that any assumed error in failing to instruct on voluntary manslaughter was harmless, in part because the defendant's own statements undermined voluntary manslaughter). See also *Heyward v. State*, 308 Ga. 570, 571-574 (842 SE2d 293) (2020) (holding that any error in failing to instruct on voluntary manslaughter was harmless, given the strong evidence of malice); *Guerrero v. State*, 307 Ga. 287, 288-289 (835 SE2d 608) (2019) (holding that any assumed error in failing to instruct on justification was harmless, because for the jury to conclude that the killing was

justified, it "would have had to independently concoct a theory of [the victim's] death that was inconsistent with the State's theory of the case, inconsistent with [the defendant's] own account of the events, and instead based upon a combination of inferences from a variety of evidentiary sources"); *Noel v. State*, 297 Ga. 698, 700-702 (777 SE2d 449) (2015) (holding that assumed errors in failing to instruct on accident and justification were harmless, in part because the defendant's "own trial testimony . . . undermined" the defenses).

Because I would affirm the trial court's judgment based on longstanding Georgia law, I respectfully dissent.

I am authorized to state that Justices Ellington, LaGrua, and Colvin join in this dissent.