NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0499
Eric Bernard Hills
v.
The State

On Appeal from the Superior Court of Chatham County
No. SPCR2103324J3

Decided: May 5, 2026

LaGrua, Justice.

Appellant Eric Bernard Hills appeals his convictions for malice murder and other crimes related to the shooting death of Branden Lewis.[1] On appeal, Hills argues that his convictions should be reversed because the trial court erred in denying his request to charge the jury on voluntary manslaughter. For the

---

[1] Lewis was shot and killed on November 11, 2020. On July 22, 2021, a Chatham County grand jury indicted Hills for the following counts: malice murder (Count 1); felony murder predicated on aggravated assault (Count 2); aggravated assault (Count 3); and possession of a firearm during the commission of a felony (Count 4). Hills was tried from March 11 to 14, 2024, and the jury found him guilty on all counts. The trial court sentenced Hills to serve life in prison with the possibility of parole for Count 1 (malice murder) and five consecutive years for Count 4 (possession of a firearm during the commission of a felony). The remaining counts merged or were vacated by operation of law. Hills filed a timely motion for new trial, which he later amended through new counsel on November 12, 2024. After holding an evidentiary hearing on the motion for new trial, the trial court denied the motion on August 4, 2025. Hills timely filed a notice of appeal on August 22, 2025. The case was docketed in this Court to the term beginning in December 2025 and submitted for a decision on the briefs.

reasons that follow, we affirm.

The evidence presented at trial showed that, around 8:00 a.m. on the morning of November 11, 2020, Hills shot Lewis six times inside the house Lewis formerly shared with Destiney Lewis, his estranged wife, and their two children. Lewis died at the scene.[2] At the time of the shooting, Lewis and Destiney had been separated for several months, and Destiney—who was then 26 years old—was in a romantic relationship with Hills—who was 17 years old at the time. According to Destiney, Lewis knew of and was angry about the relationship, and he told Destiney she was "messing with a guy that was too young for [her]" and, if he "ever saw" Hills, he was "going to beat his a**."

On the night of November 10, 2020, Lewis stayed at Destiney's house to take care of their children and to pack up the rest of his belongings.[3] That same night, unbeknownst to Lewis, Destiney and Hills stayed together in a hotel, and Destiney returned home early the next morning so Lewis could go to work. Before arriving at the house, Destiney told Hills—who was driving them in her car—to drop her off and then drive around until she contacted him, so Lewis would not see him. When Lewis left for work a short time later, Destiney texted Hills that the "coast was clear," and Hills could come back to the house.

When Hills returned, he was armed with a 9mm handgun,

---

[2] The medical examiner testified that Lewis sustained six gunshot wounds—two entry wounds in the neck, one entry wound in the back of the right shoulder, one entry wound in the right side of the back, and one entry wound on the right side of the body—and she determined that Lewis's cause of death was "multiple gunshot wounds." During the autopsy, the medical examiner removed five 9mm bullets from Lewis's body, which were all fired from the same firearm.

[3] Destiney testified that Lewis was "supposed to pack all his stuff that night" because they "were done."

which he had also carried with him to the hotel the night before. Destiney and Hills went into her bedroom to "chill[]," and while they were in the bedroom, Lewis texted Destiney that he had accidentally left his firearm at the house and needed to come back to get it.[4] Destiney testified that she did not see Lewis's text message right away, and by the time she saw it, Lewis had already arrived at the house. Destiney heard the front door open, and she exited the bedroom, closed the bedroom door, and saw Lewis coming through the front door. Destiney testified that, as Lewis started walking down the hallway towards the bedroom, she tried to hold him back, but Lewis "threw" her "out of the way."[5] Lewis opened the bedroom door and entered the bedroom, and Destiney immediately heard "maybe five" gunshots, "back-to-back." Destiney ran into the bedroom, and Hills was "stepping over" Lewis's body, saying that Lewis had "raised his hand" at Hills. Destiney started screaming and called 911.

Hills exited the house, and a short time later, he was arrested by responding officers as he tried to flee the scene in a vehicle he ordered moments after the shooting. Officers ultimately recovered a 9mm Luger pistol from under the front passenger seat of that vehicle. In the bedroom where Lewis was shot, police officers recovered six 9mm shell casings. The State's ballistics and firearms expert testified that the cartridge casings recovered from the scene and the bullets removed from Lewis's body during the autopsy were fired from the 9mm Luger recovered from the vehicle Hills had ordered.

Hills was arrested at the scene, and after being advised of

---

[4] Police officers later recovered an "inoperable" firearm from the top drawer of a dresser in the primary bedroom of the house.

[5] Destiney testified that she did not think Lewis knew Hills was in the bedroom, and she was not sure Hills knew Lewis had returned to the house.

his *Miranda*[6] rights, which Hills agreed to waive, Hills was interviewed by Savannah Police Detective Jacob Hildebrand, the lead detective in this case.[7] At the beginning of the interview, Hills denied knowing Destiney, possessing any weapons, or knowing about or having any involvement with the shooting of Lewis, claiming that he was in the area to visit a girl who lived nearby. However, later in the interview, Hills admitted that he and Destiney had been "together" for several months; that he was "inside of the house at the time the shooting occurred"; and that "he [was] the one who shot … Lewis." Hills told Detective Hildebrand that, on the morning of the shooting, he and Destiney had been "laying in Destiney's bed" when they heard the front door open, at which point Destiney "got up," opened the bedroom door, "pushed [Hills] back into the room," and closed the bedroom door. Hills then "heard someone say, 'Man, get out of the way,'" and seconds later, Lewis "storm[ed] in" the bedroom. Hills said that Lewis "raised his hand at [Hills], and [Hills] shot … Lewis." Hills told Detective Hildebrand that Lewis "didn't have a gun" when he entered the bedroom, but Destiney had warned Hills that Lewis was "going to fight" him if Lewis ever saw him. Hills initially said that the 9mm handgun he used to shoot Lewis belonged to Destiney, and Hills grabbed the gun from underneath Destiney's bed when he heard someone enter the house. However, Hills later "admitted that it was his firearm"; that he found the firearm about three months before the shooting; that "he had the firearm the day before, when they were at the hotel"; and that "he brought the firearm to the Lewis residence." At the conclusion of the interview, Hills agreed to submit to a gunshot residue test,

---

[6] See *Miranda v. Arizona*, 384 US 436 (1966).

[7] Hills's custodial interview was audio- and video-recorded and played for the jury at trial.

which tested positive for the presence of gunshot residue.

1. In Hills's sole enumeration of error, he contends—relying largely on *Allen v. State*, 319 Ga. 415, 419–21 (2024)—that the trial court erred by refusing his request to instruct the jury on voluntary manslaughter because, given the "sexual nature" of Hills's relationship with Destiney and her warning that Lewis threatened to beat up Hills if they ever met, the evidence supported a finding that Hills acted with provocation and passion in shooting Lewis six times when Lewis rushed into Destiney's bedroom on the morning of November 11. See OCGA § 16-5-2(a) (providing that "[a] person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person").

In his written requests to charge, Hills requested a jury charge on voluntary manslaughter. At the charge conference, the trial court ruled that a voluntary manslaughter charge was not appropriate in this case, explaining that,

> [t]o warrant a charge on voluntary manslaughter, there must be at least slight evidence that the accused w[as] so influenced and excited that he reacted passionately, rather than simply in an attempt to defend himself. The [c]ourt, considering the evidence that I've heard, supports finding that I did not hear slight evidence of that.

The trial court further explained that no evidence had been presented to demonstrate that, at the time of Lewis's shooting, Hills

5

was angry or mad or had any other response showing that [Hills] might have reacted passionately, as opposed to acting based on fear or in self-defense. So given the justification charge, because I do think that is warranted based on … the evidence and that … it would be in the jury's provenance [sic] to consider that. I don't see any slight evidence that would warrant the manslaughter charge, based on my reading of the law.

Following this ruling, Hills's trial counsel noted his objection for the record. However, after the final charge was given to the jury, Hills did not object to the trial court's omission of a charge on voluntary manslaughter.

We have held that "[a]n objection voiced at the charge conference does not preserve for ordinary appellate review a party's objection to the charge as subsequently given." *Jivens v. State*, 317 Ga. 859, 861 (2023). "Rather, to preserve an objection to a jury charge for ordinary appellate review, the defendant must restate his objection after the court gives its instructions and before the jury retires to deliberate." Id. And an appellant's "failure to object … to the omission of an instruction[] precludes appellate review of the instruction unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties." Id. (quotation marks omitted). See also OCGA § 17-8-58(b) ("Failure to object in accordance with subsection (a) of this Code section shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties."). In this case, because Hills failed to object after the trial court instructed the jury, our review of the trial court's omission of the

6

voluntary manslaughter charge is for plain error only. See *Jivens*, 317 Ga. at 861. See also *State v. Kelly*, 290 Ga. 29, 32 (2011) ("[U]nder OCGA § 17-8-58(b), appellate review for plain error is required whenever an appealing party properly asserts an error in jury instructions.").

To demonstrate plain error, Hills must show that "the instructional error was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Clark v. State*, 321 Ga. 732, 734 (2025) (quotation marks omitted). "For an error to be obvious for purposes of plain error review, it must be plain under controlling precedent or in view of the unequivocally clear words of a statute or rule." *Hill v. State*, 322 Ga. 700, 708 (2025) (quotation marks omitted). Here, Hills's claim fails because there was no clear or obvious error in the trial court's refusal to charge the jury on voluntary manslaughter since no evidence supporting such a charge was presented at trial. See *Metz v. State*, 321 Ga. 402, 409 (2025) ("As we have explained, a request to charge must be legal, apt, and … be authorized by the evidence." (cleaned up)). See also *Anderson v. State*, 319 Ga. 56, 61 (2024) (concluding that, when a defendant requests a jury charge, the trial court "must give the instruction if there is 'slight evidence' to support it," and "[t]he existence, or not, of that 'slight evidence' is a question of law").

> Voluntary manslaughter is committed when a person causes the death of another under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a

7

reasonable person. Under this objective standard, the reasonable person remains our barometer in this analysis, and we put aside any peculiar response the defendant may have had.

*Jivens*, 317 Ga. at 861–62 (cleaned up). Our case law addressing the propriety of giving a voluntary manslaughter charge is extensive and clear. "[F]or a voluntary manslaughter charge to be warranted, there must be at least slight evidence that the defendant, in killing the victim, acted under a serious provocation that could excite a sudden, violent, and irresistible passion in a reasonable person." *Henderson v. State*, 322 Ga. 304, 307 (2025) (quotation marks omitted).

In this case, no evidence was presented to show that Hills "acted solely as the result of a sudden, violent, and irresistible passion resulting from *serious* provocation" when he shot Lewis. *Jivens*, 317 Ga. at 862 (quotation marks omitted). Although Hills argues, in reliance on *Allen*, that Hills's act of shooting Lewis "showed provocation" because of the "sexual" relationship between Hills and Destiney "involving infidelity and prior threats," the circumstances of this case are completely different from *Allen*, where we held that "a defendant's discovery of a partner's sexual infidelity can be the sort of provocation necessary to authorize a voluntary manslaughter charge." 319 Ga. at 422. Here, Hills shot Lewis, not the other way around, and that shooting was not in response to the discovery of any infidelity. We also note the difficulty inherent in a person knowingly engaging in infidelity and then claiming the sort of provocation we have previously held to be sufficient. See id. We have never described the circumstances here as constituting the "serious provocation sufficient to excite such passion in a reasonable person," OCGA § 16-5-2(a), and Hills has pointed to no legal authority to

8

demonstrate otherwise.

Additionally, the evidence shows that Lewis had never threatened Hills directly; Lewis was not armed when he entered Destiney's bedroom; and Lewis did not say anything to Hills when he walked into the bedroom. In fact, Destiney testified that Lewis was likely unaware that Hills was inside the bedroom when he entered it, and Hills was similarly unaware that Lewis was the person entering the bedroom when Hills immediately opened fire on him. Moreover, Hills told the lead detective that he shot Lewis out of fear after Lewis "raised his hand" at Hills. Such evidence demonstrates that Hills was, "at most, … fearful and attempting to defend himself" when he shot Lewis, "not that he was angered or impassioned." *Henderson*, 322 Ga. at 307.

Because there was no evidence that Hills was "provoked in a way that supported a voluntary manslaughter instruction" when he shot Lewis, *Henderson*, 322 Ga. at 307, "it was neither clear nor obvious that a voluntary manslaughter charge was required." *Jivens*, 317 Ga. at 863. Accordingly, we conclude that the trial court did not plainly err in refusing to give such a charge, and this claim fails. See id.

*Judgment affirmed. All the Justices concur, except Warren, P. J., not participating.*

9